58 Cal.Rptr.3d 173 (2007)
149 Cal.App.4th 1554
In re CHARLISSE C., a Person Coming Under the Juvenile Court Law.
Department of Children and Family Services, Plaintiff and Respondent,
v.
Shadonna C., Defendant and Respondent;
Children's Law Center, Objector and Appellant.
No. B194568.
Court of Appeal of California, Second District, Division Five.
April 23, 2007.
*177 Akin Gump Strauss Hauer & Feld, Rex S. Heinke and Seth M.M. Stodder, Los Angeles, for Objector and Appellant.
Raymond G. Fortner, Jr., Los Angeles County Counsel, Peter Ferrera, Assistant County Counsel, for Plaintiff and Respondent.
John L. Dodd & Associates and John L. Dodd, Tustin; John Cahill, under appointment by the Court of Appeal, for Defendant and Respondent and Minor.
*178 MOSK, J.

INTRODUCTION
The Children's Law Center of Los Angeles (the Center) appeals from an order of the juvenile court disqualifying the Center from representing Charlisse C. (child), a child in a dependency proceeding. The motion to disqualify was filed by child's mother, Shadonna C. (mother), age 19, a former client of the Center. The juvenile court disqualified the Center on the ground that the Center had violated the safeguards against conflicts of interest in concurrent representations approved by the Courts of Appeal in Castro v. Los Angeles County Bd. of Supervisors (1991) 232 Cal.App.3d 1432, 1435-1445, 284 Cal. Rptr. 154 (Castro ) and People v. Christian (1996) 41 Cal.App.4th 986, 991-1002, 48 Cal.Rptr.2d 867 (Christian). This court reverses the disqualification order.
The Center is a publicly funded, nonprofit law office that represents parties in the Los Angeles County Juvenile Dependency Court. The Center is organized into three units, which are intended to function as independent law firms for conflict of interest purposes. The Center's Unit 1 (or its predecessor) represented mother when she was a foster child in the dependency system. From 2002 to 2005, Unit 2 represented child's older sibling, who was adopted by a grandparent. In this case, Unit 3 undertook to represent child when the Los Angeles County Department of Children and Family Services (DCFS) filed a juvenile dependency petition, pursuant to section 300 of the Welfare and Institutions Code,[1] concerning child. An attorney appointed to represent mother in the dependency proceeding asserted a conflict of interest, claiming that Unit 3 should be disqualified from representing child in this proceeding due to alleged breaches in ethical screens established within the Center between Units 1, 2, and 3. The alleged breaches occurred several years ago, and there is no evidence that any such breaches involved information concerning the parties in this case.
In this case involving successive representations, past breaches in the Center's ethical screens do not require disqualification of child's attorney when mother has failed to demonstrate a reasonable possibility that confidential information relating to Unit 1's prior representation of mother would be shared with or be readily accessible to child's current attorney in Unit 3. Under these circumstances, knowledge of confidential information about mother need not be imputed to child's attorney.
Contrary to the test employed by the juvenile court, the issue raised by mother's motion to disqualify the Center is not whether the Center's recent administrative reorganization and the other conduct attributed to the Center and its director gave rise to the "appearance " of a conflict of interest. Nor is the issue, as seemingly considered by the juvenile court, whether the Center's reorganization and other conduct, in the abstract, strictly adhered to the specific safeguards approved by the court in Castro, supra, 232 Cal.App.3d 1432, 284 Cal.Rptr. 154.
Rather, mother's motion for disqualification raises the issue of whether, in the circumstances of this case, there is a conflict of interest that requires the disqualification of child's attorney. Unlike Castro, supra, 232 Cal.App.3d 1432, 284 Cal.Rptr. 154, and Christian, supra, 41 Cal.App.4th 986, 48 Cal.Rptr.2d 867both of which *179 involved the concurrent representation of clients with conflicting intereststhis case involves the successive representation of clients with conflicting interests. Thus, whether there is a disqualifying conflict in this case turns on whether it is reasonably likely that confidential information relating to mother's prior representation by the Center's Unit 1 would be shared with or be readily accessible to child's current attorney in the Center's Unit 3. (See Jessen v. Hartford Casualty Ins. Co.(2003) 111 Cal. App.4th 698, 710, 3 Cal.Rptr.3d 877 (Jessen) ["where the former attorney-client relationship is peripheral or attenuated instead of direct, then the presumption [that the attorney acquired confidential client information] will not be applied in the absence of an adequate showing that the attorney was in a position vis-à-vis the client to likely have acquired confidential information material to the current representation"].) The record in this case does not support the juvenile court's conclusion that disqualification is required. Furthermore, because the juvenile court disqualified the Center based entirely on "structural" factors that bear no relation to any particular, identifiable case, affirming the juvenile court's order in this case would, in effect, require the unwarranted disqualification of the Center in virtually every case involving either the concurrent representation of multiple siblings or the successive representation of a parent or sibling and a child.[2]

BACKGROUND
The County of Los Angeles created the Center, formerly called Dependency Court Legal Services (DCLS), to provide legal services to parents and children in the dependency court, and specifically to provide representation when legal services are required under section 317. Effective July
1, 2005, such legal services are provided by the Center pursuant to a contract with the Administrative Offices of the Courts (the "2005 Agreement").
Prior to July 1, 2005, DCLS operated under an agreement with the Los Angeles County Board of Supervisors (the "1990 Agreement") that required DCLS to maintain a structure that permitted up to three independent attorneys to be assigned to represent different parties in the same proceeding, without giving rise to a disqualifying conflict of interest. To the extent relevant here, the 1990 Agreement required DCLS to maintain an operating structure as follows: "1. [DCLS] staff attorneys (i.e. those actually providing representation in dependency court proceedings) must be organized into three separate offices of comparable quality. [¶] 2. Each office shall have its own separate administrator. Each office administrator shall be the attorney of record on all cases assigned to his or her office, with the staff attorneys assigned to that office serving as deputies or assistants. Each office administrator shall be responsible for all legal representation provided by the attorneys in his or her office and shall have full case management authority over all cases assigned to that office. [¶] 3. Each office shall maintain separate case files. No staff attorney shall have access to the case files of an office other than the one to which he or she is assigned, and no corporate officer or director shall have access to any case files. [¶] 4. Attorneys may not be transferred between offices. [¶] 5. *180 [DCLS's] corporate officers and directors shall serve in an administrative capacity only and shall not participate in any way in the representation of individuals in dependency court proceedings. They shall not consult with staff attorneys, including office administrators, about individual cases, except to review performance after the matter has been completed. [¶] 6. Staff attorneys (including office administrators) shall not hold any corporate officer or director positions with [DCLS]. [¶] 7. [DCLS's] corporate officers shall promote, discipline, or dismiss a staff attorney only upon the recommendation of that attorney's office administrator. Corporate officers shall be responsible for hiring staff attorneys and for assigning them to offices in such a manner as to maintain the comparable quality of the three offices. [¶] 8. [DCLS's] corporate officers and directors may participate in the training of staff attorneys and office administrators, but such training shall be provided on an equal basis to the attorneys in the three offices. [¶] 9. Each office administrator shall establish and promulgate a procedure to receive and resolve complaints."
The 2005 Agreement changed the Center's operating structure insofar as conflicts of interest are concerned. Section B.2 of the 2005 Agreement provides, "[The Center] will ensure that conflicts are declared after appointment only when an actual conflict exists and shall similarly accept new appointments consistent with conflict rules and law. [¶] 1. New Appointments: [¶] [The Center] shall establish procedures to check for conflicts of interest, and shall decline appointment of new clients who present a conflict of interest with their present clients. [¶] 2. Ongoing Clients: [¶] [The Center] shall establish procedures to determine whether actual conflicts of interest arise among current clients, including within sibling groups, and shall advise the Court when such conflicts arise and seek to be relieved of appointment in such cases, when and if required by law."
On July 26, 2006, the DCFS, which is not a party to this appeal, filed a juvenile dependency petition concerning child. The petition alleged that child, born in July 2006, was at substantial risk of being abused or neglected because of the 19-year-old mother's emotional and mental health problems. The petition further alleged that in January 2002, at the age of 14, mother gave birth to child's older sibling, Donna C, who had been adjudicated a court dependent and ultimately adopted by a grandparent. The detention report stated that mother was a former foster youth.
At the detention hearing on July 26, 2006, the juvenile court appointed an attorney not employed by the Center to represent mother. The juvenile court then appointed an attorney from Unit 3 of the Center to represent child. The minute order provided, "CLC 3 Attorney, LINDA JACKSON ..., appears and is appointed to represent the minor(s)."
On August 18, 2006, mother filed a written motion to disqualify the Center and its Unit 3 as counsel of record for child and alleged, "This motion is based upon the grounds that the [Center] is operated as one law firm and represents clients with adverse interests, in violation of its ethical duties to its clients." Mother alleged that the Center's operating procedures changed under the 2005 Agreement and that certain events had occurred that compromised the independence of the Center's three units. Citing City and County of San Francisco v. Cobra Solutions, Inc. (2006) 38 Cal.4th 839, 851-853, 43 Cal.Rptr.3d 771, 135 P.3d 20 (Cobra Solutions), mother argued that she was a former client of *181 the Center[3] and that a Center attorney could not ethically take a position adverse to her without breaching its continuing "duty of loyalty" to her.
With respect to the Center's operating procedures, mother referenced an October 20, 2005 memorandum to the Center's staff from its director, Ms. Miriam Krinsky. The memorandum provided:
"1. [The Center] staff will continue to be assigned by [the Center's] executive leadership to a core unit or such other conflict unit or units as [the Center] may choose to maintain over time (currently denoted as [Unit Nos.] 1, 2, and 3). The conflict unit or units will handle cases with siblings where conflicts of interest are present (`conflict cases')to be denoted on [the Center's] file and records as conflict casesas well as any other nonconflict cases that may previously or in the future be assigned to that unit. Attorneys in all [Center] units will continue to pick up new cases in accordance with their assigned pick up days, as determined by [the Center's] supervisors. Any determination that a conflict exists in a given case will be made only after consultation with, and approval by, a supervisor, as set forth in [the Center's] conflict policy. [¶] 2. Each of [the Center's] units will operate pursuant to the procedures set forth herein to ensure that ethical walls for handling conflict cases within [the Center] remain in place and are honored at all times. Any questions or concerns that these procedures do not adequately preserve the separateness of conflict cases or that these procedures are not being complied with shall be directed to [the Center's] Executive Director or the appropriate unit head. [¶] 3. Each [Center] unit shall have a unit head. The conflict unit head(s) shall ensure that conflict case files and all confidential case information relating to conflict cases assigned to a given unit are maintained by that unit, remain separate from the case files and confidential case information of the core firm and any other conflict unit(s), and cannot be accessed by any staff outside the conflict unit. The conflict unit(s) head(s) and any other conflict unit supervisors shall supervise, direct and coordinate the day-to-day representation and case-related decision making in regard to conflict cases and conflict clients assigned to that unit and will be the final decision-maker in regard to those case-specific issues. [¶] 4. Our practice for promoting, terminating or disciplining [the Center] lawyers or staff members is unchanged. The [Center] Executive Director or his or her designee will remain the final decision-maker after considering a recommendation from the unit head or supervisor of that staff member, along with the basis for that recommendation. In evaluating that recommendation, the [Center] Executive Director will not have access to conflict unit case files, or any conflict unit client confidential information. [¶] 5. No attorney shall have access to the case files or confidential client information relating to any clients of other units in conflict with that attorney's clients. [¶] 6. Where no conflict of interest or ethical concerns exist, cases may be reassigned within [the Center], and in particular from the conflict unit(s) to the core firm. [¶] 7. [The Center's] executive leadership shall be responsible for hiring and training staff attorneys and for assigning them, as appropriate and consistent with the Board's restructuring plan, to the core firm or conflict unit(s). All attorneys and staff shall receive training regarding the necessity of maintaining client confidences. [¶] 8. [The Center] will continue to remain counsel for all clients assigned to [the Center]. To ensure that the appropriate staff *182 member receives notices, pleadings, and other information relating to clients, individual attorneys within [the Center] will serve as the responsible attorneythe attorney of recordfor cases assigned to that attorney. If those individual attorneys leave [the Center's] employ or change courtrooms or caseloads, a notice will be filed with the court and sent to all critical persons and entities, designating the new responsible attorney of record within [the Center]. As noted above, the conflict unit head(s) will maintain ultimate and final responsibility for the supervision, direction and coordination of case-related decision making in regard to conflict cases and conflict clients assigned to that unit and will be the final decision-maker in regard to those case-specific issues."
Mother submitted additional evidence that included the following: In January 2003, Ms. Krinsky requested that an attorney in one of the units "quash" a subpoena for an employee of DCFS; in 2003, Ms. Krinsky asked questions indicating that she "had knowledge" about a case in one of the units; in June 2003, Ms. Krinsky had the Center's computer administrator put her e-mail address on the interoffice e-mail group of each of the three law units, although this practice was discontinued shortly thereafter; in 2003, Ms. Krinsky imposed a policy on all three units that required her approval before a Code of Civil Procedure section 170.6 affidavit of prejudice could be used on a "blanket" basis or in a "class of cases" to disqualify a judicial officer, although this procedure was suspended less than a year later; in 2005, when an attorney left the Center, Ms. Krinsky transferred cases among the three units; Ms. Krinsky once asked one of the attorneys in Unit 2 about a case; secretaries transferred among the units; the Center terminated the employment of one of the attorneys in one of the units; and the units shared the same library.
At the disqualification hearing on September 22, 2006, the juvenile court stated: "I get the impression that [the Center] says one thing and does something else. [11] They have established a structure which they claim they strictly adhere to, but the underlying facts suggest otherwise." The juvenile court concluded that, regardless of the Center's internal operating procedures, the Center's "ethical walls may have been breached" giving the "appearance of conflict." The juvenile court indicated that it would grant an evidentiary hearing before ruling on the matter, but the Center declined the offer and submitted on the tentative ruling. The juvenile court granted the disqualification motion but stayed the order for one week. The Center timely appealed.

DISCUSSION

A. The Center Has Standing to Seek Appellate Review of the Disqualification Order.
Mother contends that the Center lacks standing to appeal the disqualification order. Child, now represented on appeal by independent counsel assigned by the California Appellate Project, joins in mother's standing contention. The standing issue arises because neither mother; child; nor the Center's Unit 3J which was the attorney of record in the juvenile court, sought appellate review of the disqualification order. Mother argues that the Center is an umbrella entity that is neither an "aggrieved" party nor the attorney that was actually disqualified.
A party has standing to seek review of a judgment or order by demonstrating that the party is legally aggrieved within the meaning of Code of Civil Procedure section 902. (Crook v. Contreras (2002) 95 Cal.App.4th 1194, 1201, 116 Cal. *183 Rptr.2d 319; Bratcher v. Buckner (2001) 90 Cal.App.4th 1177, 1184, 109 Cal.Rptr.2d 534.) "One is considered, `aggrieved' whose rights or interests are injuriously affected by the judgment. [Citations.] Appellant's interest `"must be immediate, pecuniary, and substantial and not nominal or a remote consequence of the judgment.'" [Citation.]" (County of Alameda v. Carleson (1971) 5 Cal.3d 730, 737, 97 Cal.Rptr. 385, 488 P.2d 953; accord, United Investors Life Ins. Co. v. Waddell & Reed, Inc. (2005) 125 Cal.App.4th 1300, 1304-1305, 23 Cal.Rptr.3d 387.) "`[A] party must be "beneficially interested" (Code Civ. Proc., § 1086), i.e., have "some special interest to be served or some particular right to be preserved or protected over and above the interest held in common with the public at large." [Citation.] This standard ... is equivalent to the federal "injury in fact" test, which requires a party to prove by a preponderance of the evidence that it has suffered "an invasion of a legally protected interest that is `(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.' " [Citation.]' (Associated Builders & Contractors, Inc. v. San Francisco Airports Com. (1999) 21 Cal.4th 352, 361-362[, 87 Cal.Rptr.2d 654, 981 P.2d 499].)" (Syngenta Crop Protection, Inc. v. Helliker (2006) 138 Cal.App.4th 1135, 1182, 42 Cal. Rptr.3d 191; see Carsten v. Psychology Examining Com. (1980) 27 Cal.3d 793, 796, 166 Cal.Rptr. 844, 614 P.2d 276 [to show beneficial interest party must show "some special interest to be served or some particular right to be preserved or protected over and above the interest held in common with the public at large"].) "The purpose of a standing requirement is to ensure that the courts will decide only actual controversies between parties with a sufficient interest in the subject matter of the dispute to press their case with vigor. [Citations.]" (Common Cause v. Board of Supervisors (1989) 49 Cal.3d 432, 439, 261 Cal.Rptr. 574, 777 P.2d 610; Holmes v. California Nat. Guard (2001) 90 Cal. App.4th 297, 314-315, 109 Cal.Rptr.2d 154.)
Since 1990, the Center and its predecessor organization, DCLS, have provided legal representation to children and other litigants in dependency litigation in Los Angeles County. The Center is contractually obligated to the Administrative Office of the Courts to provide conflict-free representation to children in dependency litigation. The Center has a substantially immediate and concrete stake in the present litigation. The Center's interest is not nominal or remote. Further, because of the on-going contractual obligations owed to the Administrative Office of the Courts, the Center has a sufficient interest to pursue its position. The Center meets the tests for standing to appeal. (Associated Builders & Contractors, Inc. v. San Francisco Airports Com., supra, 21 Cal.4th at pp. 361-362, 87 Cal.Rptr.2d 654, 981 P.2d 499; Carsten v. Psychology Examining Com., supra, 27 Cal.3d at p. 796, 166 Cal. Rptr. 844, 614 P.2d 276; County of Alameda v. Carleson, supra, 5 Cal.3d at p. 737, 97 Cal.Rptr. 385, 488 P.2d 953.)

B. The Juvenile Court Erred in Disqualifying the Center.

1. Standard of Review.
"Generally, a trial court's decision on a disqualification motion is reviewed for abuse of discretion. [Citations.] If the trial court resolved disputed factual issues, the reviewing court should not substitute its judgment for the trial court's express or implied findings supported by substantial evidence. [Citations.] When substantial evidence supports the trial court's factual findings, the appellate court reviews the conclusions based on those *184 findings for abuse of discretion. [Citation.] However, the trial court's discretion is limited by the applicable legal principles. [Citation.] Thus, where there are no material disputed factual issues, the appellate court reviews the trial court's determination as a question of law. [Citation.] In any event, a disqualification motion involves concerns that justify careful review of the trial court's exercise of discretion. [Citation.]" (SpeeDee Oil supra, 20 Cal.4th at pp. 1143-1144, 86 Cal.Rptr.2d 816, 980 P.2d 371; see also Cobra Solutions, supra, 38 Cal.4th at p. 848, 43 Cal. Rptr.3d 771,135 P.3d 20.)

2. General Principles.
Although this court reviews a juvenile court's ruling on a motion for disqualification for abuse of discretion, that discretion "is limited by the applicable legal principles." (SpeeDee Oil, supra, 20 Cal.4th at p. 1144, 86 Cal.Rptr.2d 816, 980 P.2d 371.) To understand the bounds of the juvenile court's discretion in this case, it is important to review the relevant general principles.

(a) Conflicts of Interest and Vicarious Disqualification.
Conflicts of interest (conflicts) arise in legal representation when "there is a substantial risk that the lawyer's representation of the client would be materially and adversely affected by the lawyer's own interests or by the lawyer's duties to another current client, a former client, or a third person." (Rest.3d of the Law Governing Lawyers, § 121 (Restatement); see Flatt v. Superior Court (1994) 9 Cal.4th 275, 282-283 & fn. 2, 36 Cal.Rptr.2d 537, 885 P.2d 950 (Flatt).) Conflicts typically implicate two of lawyers' most basic duties to their clients: the duty of undivided loyalty and the duty to protect confidential client information. (Cobra Solutions, supra, 38 Cal.4th at p. 846, 43 Cal.Rptr.3d 771,135 P.3d 20.)
For example, absent both clients' informed written consent (Cal. Rules of Prof. Conduct, rule 3-310(A) (CRPC)), a lawyer may not simultaneously represent two clients who have adverse interests. (CRPC Rule 3-310(C); see ABA Model Rule of Professional Conduct, rule 1.7(a) (Model Rules).)[4] This is because the lawyer, in the course of vigorously representing one client, Client A, has the capacity to be disloyal to the other, Client B, by failing to recommend, assert, or vigorously advocate legal, factual, or negotiating positions that are favorable to Client B but harmful to Client A. (Flatt, supra, 9 Cal.4th at p. 282, 36 Cal.Rptr.2d 537, 885 P.2d 950; see generally, Model Rule 1.7 corns. [6]-[8].) The lawyer would also be able to disclose or misuse confidential information relating to Client B to gain an advantage for Client A. (SpeeDee Oil, supra, 20 Cal.4th at p. 1147, 86 Cal.Rptr.2d 816, 980 P.2d 371; see generally, 1 Hazard & Hodes, The Law of Lawyering (3d ed.2007 supp.) Conflicts of Interest, § 10.2, pp. 10-6 to 10-10 (Hazard & Hodes).) Situations involving the simultaneous representation of conflicting interests are sometimes referred to as "concurrent" conflicts. (See generally, 1 Vapnek et al, Cal. Practice Guide: Professional Responsibility (The Rutter Group 2006) ¶¶ 4:27-4:50, pp. 4-11 to 4-20.1.)
Similarly, a lawyer may not, without informed written consent, represent a new client, Client C, whose interests are adverse to those of a former client, Client D, when the lawyer obtained confidential in *185 formation from Client D that is "material to the employment" with Client C. (CRPC Rule 3-310(E); Cobra Solutions, supra, 38 Cal.4th at pp. 846-847, 43 Cal.Rptr.3d 771, 135 P.3d 20; see also Model Rule 1.9(a).) Although a lawyer's duty of loyalty in such circumstances runs only to the new client, Client C, the lawyer's duty to protect Client D's confidential information persists even after their client-lawyer relationship ends. (SpeeDee Oil, supra, 20 Cal.4th at pp. 1146-1147, 86 Cal.Rptr.2d 816, 980 P.2d 371.) Because the lawyer, who is duty-bound vigorously to represent Client C, might be tempted to disclose or misuse the confidential information of Client D, the lawyer is faced with conflicting duties to his present and former clients. (Cobra Solutions, supra, 38 Cal.4th at p. 847, 43 Cal.Rptr.3d 771, 135 P.3d 20.) Such circumstances are sometimes referred to as "successive" conflicts. (See generally, 1 Vapnek, supra, 114:160 at pp. 4-58.9 to 4-58.10.)
The ethics rules and judicial decisions that, govern conflicts are primarily intended to prevent, rather than to remedy or to punish, breaches of lawyers' duties of loyalty and confidentiality. (See 1 Hazard & Hodes, supra, Conflicts of Interest, § 10.4 at pp. 10-12 to 10-13.) "`The [conflict of interest rules are] designed not alone to prevent the dishonest practitioner from fraudulent conduct,' but also to keep honest attorneys from having to choose between conflicting duties, or being tempted to reconcile conflicting interests, rather than fully pursuing their clients' rights." (SpeeDee Oil, supra, 20 Cal.4th at p. 1147, 86 Cal.Rptr.2d 816, 980 P.2d 371, quoting Anderson v. Eaton (1930) 211 Cal. 113, 116, 293 P. 788.)
In the litigation context, in which the adversarial nature of proceedings makes the lawyer's dilemma particularly acute, courts may disqualify a lawyer who is precluded from representing one or more parties to the litigation by a conflict. (Cobra Solutions, supra, 38 Cal.4th at p. 846, 43 Cal.Rptr.3d 771, 135 P.3d 20.) Disqualification not only prevents the lawyer from breaching his or her duties, but also protects the judicial process from any taint of unfairness that might arise from the conflict. (Ibid. [the "`paramount concern [in disqualification proceedings] must be to preserve public trust in the scrupulous administration of justice and the integrity of the bar'"]; see 1 Hazard & Hodes, supra, Conflicts of Interest, at § 10.2 at pp. 10-7 to 10-8.)
Accordingly, a litigant seeking to disqualify a lawyer does not need to demonstrate an actual breach of duty. A lawyer who represents clients with adverse interests in the same litigation automatically will be disqualified, as will a lawyer who switches sides during pending litigation, because both situations present an unacceptable risk that the lawyer's duties of loyalty and confidentiality will be compromised. (Cobra Solutions, supra, 38 Cal.4th at p. 846, 43 Cal.Rptr.3d 771, 135 P.3d 20.) A lawyer who concurrently represents adverse litigants in entirely unrelated matters will also be disqualified, even when there is no possibility that confidential information will be misused, because of the risk that the attorney's duty of undivided loyalty to each client will be compromised. (Flatt, supra, 9 Cal.4th at pp. 284-287, 36 Cal.Rptr.2d 537, 885 P.2d 950; Truck Ins. Exchange v. Fireman's Fund Ins. Co. (1992) 6 Cal.App.4th 1050, 1056-1059, 8 Cal.Rptr.2d 228.)
In successive-conflict cases, a lawyer will be disqualified if the lawyer's representation of a current client is "substantially related" to the lawyer's representation of a former client. (Cobra Solutions, supra. 38 Cal.4th at p. 847, 43 Cal. *186 Rptr.3d 771, 135 P.3d 20; CRPC 3-310(E); see Model Rule 1.9(a).) The party seeking disqualification does not have to establish that the lawyer actually possesses material confidential information. Rather, "if the subject of the prior representation put the attorney in a position in which confidences material to the current representation would normally have been imparted to counsel," the court will conclusively presume that the lawyer possesses such information. (Cobra Solutions, supra, 38 Cal.4th at p. 847, 43 Cal.Rptr.3d 771, 135 P.3d 20.) "[T]he rule followed in California is that the attorney's possession of confidential information will be presumed only when `"a substantial relationship has been shown to exist between the former representation and the current representation, and when it appears by virtue of the nature of the former representation or the relationship of the attorney to his former client confidential information material to the current dispute would normally have been imparted to the attorney...."` [Citation.]" (H.F. Ahmanson & Co. v. Salomon Brothers, Inc. (1991) 229 Cal.App.3d 1445, 1454, 280 Cal.Rptr. 614.)
Accordingly, "whether an attorney should be disqualified in a successive representation case turns on two variables: (1) the relationship between the legal problem involved in the former representation and the legal problem involved in the current representation, and (2) the relationship between the attorney and the former client with respect to the legal problem involved in the former representation." (Jessen, supra, 111 Cal.App.4th at p. 709, 3 Cal.Rptr.3d 877.) "If the relationship between the attorney and the former client is shown to have been directthat is, where the lawyer was personally involved in providing legal advice and services to the former clientthen it must be presumed that confidential information has passed to the attorney and there cannot be any delving into the specifics of the communications between the attorney and the former client." (Ibid.) "However, if the court determines the former attorney was not placed in a direct, personal relationship with the former client, the court must assess whether the attorney was positioned during the first representation so as to make it likely the attorney acquired confidential information relevant to the current representation, given the similarities or lack of similarities between the two." (Id. at p. 711, 3 Cal. Rptr.3d 877; accord, Adams v. Aerojet-General Corp. (2001) 86 Cal.App.4th 1324, 1333, 104 Cal.Rptr.2d 116 [inquiry is "whether the attorney was reasonably likely to have obtained confidential information"]; Ochoa v. Fordel, Inc. (2007) 146 Cal.App.4th 898, 907-909, 53 Cal.Rptr.3d 277 [same].)
Furthermore, in most cases, if a lawyer is personally disqualified from representing a client in a particular matter, that disqualification extends to all lawyers in the same law firm. (Cobra Solutions, supra, 38 Cal.4th at pp. 847-848, 43 Cal. Rptr.3d 771, 135 P.3d 20.) This is because "attorneys, working together and practicing law in a professional association, share each other's, and their clients', confidential information." (SpeeDee Oil, supra, 20 Cal.4th at pp. 1153-1154, 86 Cal.Rptr.2d 816, 980 P.2d 371.) Rather than inquire as to whether confidential information actually was shared, the law imputes knowledge of confidential client information to all lawyers in the firm, thus compelling the disqualification of all lawyers so "tainted." (Id. at pp. 1153-1155, 86 Cal.Rptr.2d 816, 980 P.2d 371.) This is the doctrine of "vicarious disqualification." (See generally, 1 Vapnek, supra, ¶¶ 4:203-4:205.1 at pp. 4-60.13 to 4-61.)
*187 Two aspects of the doctrine of vicarious disqualification deserve particular mention in relation to this case. First, because the doctrine is based on the presumption that lawyers within firms share client confidences, vicarious disqualification in a particular case will extend only to lawyers in the same "law firm" as the lawyer personally disqualified. (See Christian, supra, 41 Cal.App.4th at p. 1000, 48 Cal.Rptr.2d 867.) "Law firm" in this context is not limited to traditional private law firms, but may extend to lawyers whose association is such that they "have mutual access to information concerning the clients they serve." (Model Rule 1.0(c) & com. [2].) This may include "lawyers employed in a legal services organization." (Model Rule 1.0(c); see post at B.2.(b).) "Depending upon the structure of the organization, the entire organization or different components of it may constitute a firm or firms" for purposes of the conflict-of-interest rules. (Model Rule 1.0 com. [4]; see generally, 1 Hazard & Hodes, supra, Imputed Disqualification, § 14.5 at pp. 14-12 to 14-14.) In the context of private law firms, there is no definitive authority in California as to whether a so-called "ethical wall" or "ethical screen"a mechanism that prevents individual lawyers in a firm representing an existing client from intentionally or inadvertently obtaining material confidential information relating to the prior representation of another clientcan be used to preclude vicarious disqualification in successive-conflict cases. (See Hitachi Ltd. v. Tatung Co. (N.D.Cal.2006) 419 F.Supp.2d 1158, 1161-1164 [reviewing cases]; 1 Vapnek, supra, ¶ 4:204.4 at pp. 4-60.14 to 4-61; St. John, Screened Out: When an Ethical Screen Can Be Used to Avoid Vicarious Disqualification of a Law Firm Remains Unsettled (Feb.2005) Los Angeles Lawyer 29-30, 32-34.)
Second, in cases of successive conflicts, vicarious disqualification is required only if the lawyers in a firm are still "tainted" by imputed knowledge of a former client's confidential information. If the attorney or attorneys who personally would be disqualified have left the firm, then disqualification of the firm may not be required. "When ... the [law firm] relationship between the tainted attorneys and nontainted attorneys is in the past, there is no need to `rely on the fiction of imputed knowledge to safeguard client confidentiality' and opportunity exists for a `dispassionate assessment' of whether confidential information was actually exchanged." (Goldberg v. Warner/Chappell Music, Inc. (2005) 125 Cal.App.4th 752, 765, 23 Cal.Rptr.3d 116 (Goldberg), quoting Adams v. Aerojet-General Corp., supra, 86 Cal.App.4th at p. 1335, 104 Cal. Rptr.2d 116.) Model Rule 1.10(b), cited with approval in Goldberg, supra, 125 Cal. App.4th at pp. 765-766, 23 Cal.Rptr.3d 116, addresses this issue, stating, "`When a lawyer has terminated an association with a firm, the firm is not prohibited from thereafter representing a person with interests materially adverse to those of a client represented by the formerly associated lawyer and not currently represented by the firm, unless (1) the matter is the same or substantially related to that in which the formerly associated lawyer represented the client; and (2) any lawyer remaining in the firm has [confidential client information].'" This concept is also contained in the Restatement.[5]

*188 (b) Vicarious Disqualification and Legal-Services Agencies.
The conflicts-of-interest principles described above largely developed and are typically applied in cases involving private law firms. (Christian, supra, 41 Cal. App.4th at p. 997, 48 Cal.Rptr.2d 867.) To some extent, cases involving legal-services agencies, including public law offices, present different circumstances that have justified modifying some of those principles. (Id. at pp. 997-998, 48 Cal.Rptr.2d 867.)
First, legal services lawyers "do not have a financial interest in the matters on which they work. As a result, they may have less, if any, incentive to breach client confidences." (City of Santa Barbara, supra, 122 Cal.App.4th at p. 24, 18 Cal. Rptr.3d 403.) They do not have to attract new clients through client referrals or solicitation, nor must they worry about retaining a fee-generating base of recurrent clients. (Castro, supra, 232 Cal.App.3d at 1441, 284 Cal.Rptr. 154.)
Second, disqualification of legal services attorneys "can result in increased public expenditures for legal representation, and `there is the potential for a substantially increased call upon an already severely strained tax base.'" (In re Lee G. (1991) 1 Cal.App.4th 17, 28, 1 Cal.Rptr.2d 375, quoting People v. Municipal Court (Byars) (1978) 77 Cal.App.3d 294, 301, 143 Cal.Rptr. 491; accord, Cobra Solutions, supra, 38 Cal.4th at p. 851, 43 Cal.Rptr.3d 771, 135 P.3d 20.) Disqualification should therefore be avoided if the benefit is "only speculative or minimal." (In re Lee G., supra, 1 Cal.App.4th at p. 28, 1 Cal. Rptr.2d 375.)
Third, as a general matter, public law offices often develop specific expertise in particular areas of law, and disqualification may deprive the office's clients of the benefits of this acquired and cultivated expertise. (Cobra Solutions, supra, 38 Cal.4th at p. 851, 43 Cal.Rptr.3d 771, 135 P.3d 20; City of Santa Barbara, supra, 122 Cal. App.4th at p. 24, 18 Cal.Rptr.3d 403.) Although there is no indication that any party in this case has been deprived of qualified counsel, according to the Center's Web site, "[w]ith a 185 person staff of lawyers, paralegals, and investigators, [the Center] represents more than 80% of the nearly 30,000 children under the jurisdiction of the dependency court." (About Children's Law Center, http://www.clcla. org/about.htm (as of April 6, 2007).) Disqualification of the Center in a substantial number of cases would have an impact on the availability of qualified, experienced child welfare counsel in Los Angeles County.
Relying largely on these considerations, California courts have permitted the use of ethical screens to avoid vicarious disqualification in successive-conflicts cases involving (1) a former public-sector lawyer moving into a private firm, when the lawyer was not directly involved in the relevant matter (Chambers v. Superior Court (1981) 121 Cal.App.3d 893, 902-903, 175 Cal.Rptr. 575); (2) a former private-sector lawyer moving into a public law office, when the lawyer was directly and personally involved in the relevant matter (City of Santa Barbara, supra, 122 Cal.App.4th at pp. 26-27, 18 Cal.Rptr.3d 403); and (3) a lawyer moving from one legal-services agency to an adverse legal-services agency (Chadwick v. Superior Court (1980) 106 Cal.App.3d 108, 118-119, 164 Cal.Rptr. 864 [former public defender employed by prosecutor's office].) The use of ethical screens in such circumstances is also permitted by both the Model Rules and the Restatement. (Model Rule 1.11(b), (d); *189 Restatement, § 124(3); cf. Cobra Solutions, supra, 38 Cal.4th at pp. 852-854, 43 Cal.Rptr.3d 771, 135 P.3d 20 [ethical screens insufficient when lawyer, who personally and directly represented adverse client while in private practice, subsequently occupies position as head of office, with power to review, hire and fire lawyers working on case].)

3. The Center Should Not Have Been Disqualified in this Case.
Applying the principles discussed above, the juvenile court applied the wrong legal standard in deciding mother's motion to disqualify. The factors set forth in Castro, supra, 232 Cal.App.3d 1432, 284 Cal.Rptr. 154, are not necessarily dispositive in successive-conflict cases when the attorney at issue was not personally and directly involved in representing the prior client. Furthermore, even if the juvenile court did not err in applying Castro, it nevertheless erred in concluding that disqualification was required in this case.
The juvenile court found, "There was no specificto this caseconflict raised in terms of the divulgence of any confidential or privileged communication." This finding is determinative. California courts do not disqualify lawyers on conflict-of-interest groundsparticularly lawyers from legal-services agencieswhen the lawyer has no actual or imputed conflict of interest. (See Goldberg, supra, 125 Cal. App.4th at pp. 764-765, 23 Cal.Rptr.3d 116 [no vicarious disqualification when attorney who worked on matter no longer associated with firm and had not actually shared confidential information]; Hetos Investments, Ltd. v. Kurtin (2003) 110 Cal. App.4th 36, 47, 1 Cal.Rptr.3d 472 [disqualification appropriate "`only where the appearance of impropriety arises in connection with a tangible dereliction' " (italics added) ], quoting Gregori v. Bank of America (1989) 207 Cal.App.3d 291, 306, 254 Cal.Rptr. 853.) Contrary to the juvenile court's suggestion, "an appearance of impropriety by itself does not support a lawyer's disqualification." (DCH Health Services Corp. v. Waite (2002) 95 Cal. App.4th 829, 833, 115 Cal.Rptr.2d 847.)
The juvenile court expressly stated that the issue before it was "whether or not, inherently or in practice, the [Center] has violated the ethical constraints enunciated in Castro." The juvenile court concluded that it found "a violation in this case of the Castro and Christian safeguards regarding conflict of interest in representing multiple parties in the same action." Unlike both Castro, supra, 232 Cal.App.3d 1432, 284 Cal.Rptr. 154, and Christian, supra, 41 Cal.App.4th 986, 48 Cal.Rptr.2d 867, however, this is not a concurrent-conflict case, in which the Center "represented] multiple parties in the same action." This is a successive-conflict case. As a result, a finding that the Center "violated" the safeguards set forth in Castro does not automatically compel disqualification.[6]
Castro, supra, 232 Cal.App.3d 1432, 284 Cal.Rptr. 154, was an action for declaratory and injunctive relief, in which the plaintiffs sought to enjoin the Center's predecessor, DCLS, from providing representation to multiple parties in dependency *190 proceedings on the ground that such multiple representation created conflicts of interest. (Id. at pp. 1434-1435, 284 Cal.Rptr. 154.) The plaintiffs argued that DCLS, which was structured into three independent practice groups serviced by a single administrative unit (id. at p. 1437, 284 Cal.Rptr. 154), was analogous to a private law firm, and should be treated as a single "law firm" for purposes of applying the vicarious disqualification doctrine. (Id. at pp. 1441-1442, 284 Cal.Rptr. 154.) The Court of Appeal rejected both arguments. DCLS did not represent private, paying clients, so there was no incentive for DCLS to favor any one client over another. (Id. at p. 1441, 284 Cal.Rptr. 154.) DCLS had only "one source of clients in a single kind of legal proceeding, and does not solicit clients or accept referrals from the public." (Id. at p. 1442, 284 Cal.Rptr. 154.) In addition, DCLS had been "structured so its attorneys and its separate groups have no contact with one another." (Ibid.) Each of the three groups at DCLS had a policy in place "to decline representation whenever one of its attorneys had a conflict of interest arising out of pre-DCLS representation of a client." (Id. at p. 1443, 284 Cal.Rptr. 154.) The Court of Appeal concluded that "the DCLS arrangement" did not "constitute the appearance of,[[7]] or any actual, ethical impropriety" (id. at p. 1444, 284 Cal.Rptr. 154), and therefore affirmed the juvenile court's denial of a preliminary injunction. (Id. at p. 1445, 284 Cal.Rptr. 154; see Cobra Solutions, supra, 38 Cal.4th at p. 849, 43 Cal.Rptr.3d 771, 135 P.3d 20 ["In both Castro and Christian, supra, 41 Cal. App.4th 986, 48 Cal.Rptr.2d 867, the separate law units under a single governmental umbrella operated as separate law firms independent of parallel units also sheltered under that umbrella].")
Accordingly, although Castro, supra, 232 Cal.App.3d 1432, 284 Cal.Rptr. 154, describes safeguards that might immunize the Center from disqualification in all cases of potential concurrent conflict, it says nothing about when disqualification might be required in a particular case, especially a case involving a successive conflict. Indeed, the court in Castro emphasized that "rulings on disqualifications must proceed according to the circumstances of each case, in light of several competing interests" (id. at p. 1441, 284 Cal.Rptr. 154), and refused to discuss "possible" conflicts of a "hypothetical nature," stating that "[speculative contentions of conflict of interest cannot justify disqualification of counsel." (Id. at p. 1442, 284 Cal.Rptr. 154.) Castro does not support the conclusion, inherent in the juvenile court's order here, that a technical violation of one or more of the safeguards present in that case requires automatic disqualification in all successive-conflict cases or even in all cases.
This case illustrates why an automatic disqualification rule is unsound: none of "violations" of the "safeguards" referred to in Castro, supra, 232 Cal.App.3d 1432, 284 Cal.Rptr. 154, bears any demonstrable relation to the attorneys or the parties involved in this case. Even accepting the juvenile court's conclusion that the "violations" justify treating the Center's three units as a single "law firm" for purposes of disqualification, the record establishes that those, "violations" have been, at most, temporary and sporadic. There is no showing that they are ongoing. The juvenile court made no findings with regard to what period of time the violations persisted, or for what particular cases the three units' separate *191 existence must be disregarded. Finding that the Center must be treated as a single unit for all time and for all cases involving successive representation would be unwarranted. Yet, the disqualification in this case, with no evidence to link the "violations" to the particular attorneys or parties involved, implies precisely such a finding.
A simple hypothetical demonstrates this proposition. Assume that Law Firm currently represents Client A, whose interests are adverse to former Client Z, but Law Firm is permitted to represent Client A because a different attorney is handling the matter and an effective ethical screen (assuming, for these purposes, that ethical screens can be employed to prevent vicarious disqualification) has been put in place. Assume further that Law Firm represents Client B, whose interests are adverse to former Client Y, but again, Law Firm is permitted to represent Client B because a different attorney is handling the matter and an ethical screen has been put in place.
A material breach of the ethical screen in the case involving Client A and former Client Z would result in disqualifying Law Firm from representing Client A, even absent evidence that confidential information was actually disclosed, because of the risk that Client Z's confidential information might have been disclosed or misused, and because the proceedings with respect to Client A have been tainted by the breach. But, the breach in the case involving Client A and former Client Z would not justify disqualifying Law Firm from representing Client B, because there is no increased risk that Client Y's confidential information has been disclosed or misused, nor have the proceedings with respect to Client B been tainted. Yet, the anomalous result reached by the juvenile court in this case would disqualify Law Firm from representing Client B, on evidence of a relevant conflict of interest and an ethical breach that is much weaker than the assumptions made in the hypothetical.
Indeed, the disqualification in this case is not based on competent, relevant evidence of a disqualifying conflict of interest, but is the result of speculation, imputation, and presumption. The following is the evidence relating to the alleged breaches of the ethical screens in this case, and the effect or relevance of that evidence.
 The record contains no competent evidence that, in fact, the Center's Unit 1 or its predecessor ever represented mother. The juvenile court appears to have accepted the statements of mother's lawyer of such representation, and the Center has never disputed the accuracy of those statements. Assuming that the Center did represent mother, the juvenile court made no findings, and the record does not clearly establish, when mother was a client of the Center's Unit 1 or its predecessor; the most that can be inferred is that the representation began in or around 2001. The record does not indicate which attorney or attorneys represented mother, or whether that attorney is still employed by the Center. There is thus no evidence that any attorney employed by the Center is currently subject to a personal disqualifying conflict, nor is there any evidence that mother's case was so notorious or unique that it remains the subject of clear memory or is still discussed among the Center's staff.
 The present case was commenced in July 2006. There is no evidence that any of the files from mother's case in Unit 1 are accessible to, or have been reviewed or are likely to be inadvertently discovered by, child's attorney in Unit 3. The evidence, in fact, is to *192 the contrary. The head of Unit 1 declared that, currently, the ethical screens between Unit 1 and Unit 3 are "strictly adhere[d] to and enforce[d]," and that he personally "ensure[s] that no attorneys or staff from ... [Unit] 3 have access to the case files and client confidential information relating to cases assigned to [Unit] 1." The head of Unit 3 declared that Unit 3 "attorneys and staff ... have no access to the case files and client confidential information relating to cases assigned to [Unit] 1...." Further, none of the purported "violations" of the ethical screens occurred while this case was pending. Child's attorney in Unit 3 thus had neither the opportunity nor the incentive to exploit any purported breach in the ethical screens to learn mother's confidential information, nor is there any evidence that child's attorney did so.
 Unit 2's representation of child's older sibling, beginning in or about 2002, is irrelevant. That representation was adverse to motherthat was the reason that a Unit 2 attorney was appointed to represent the older sibling. There is no presumption or indication that Unit 2 learned mother's confidential information, nor can anything learned by Unit 2 during the course of that representation constitute grounds for disqualification in this case.
 There is evidence that in 2003, Ms. Krinsky, then the Executive Director of the Center, attempted to have a staff attorney in Unit 2 of the Center move to quash a subpoena involving a child who was a party in a federal action. Even if true, it is irrelevant to the disqualification in this case. Ms. Krinsky's action did not reveal or tend to reveal any confidential information, let alone information relating to the representation in the instant case; it is the existence of such a revelation that is the relevant consideration in cases of successive conflicts. Even if this was a concurrent-conflict case, which directly implicated the attorney's duty of loyalty, there is no evidence that Ms. Krinsky had the authority to take, actually took, or threatened any punitive action against the staff attorney, or that the professional independence of any attorney in any matter has been compromised.
 There is evidence that Ms. Krinsky imposed a policy on all three offices to require her personal approval before filing blanket or class-of-cases affidavits of prejudice against judicial officers under Code of Civil Procedure section 170.6. Again, this is irrelevant. Nothing in Castro, supra, 232 Cal. App.3d 1432[, 284 Cal.Rptr. 154], prevents an office administrator from setting office policy, particularly when the policy is one that precludes attorney-employees from perpetuating a specific tactical abuse expressly disapproved by the California Supreme Court. (Solberg v. Superior Court (1977) 19 Cal.3d 182, 203[, 137 Cal.Rptr. 460, 561 P.2d 1148].)
 Ms. Krinsky asked case-specific questions of two now-former Center attorneys between 2002 and 2004. The declarants failed to identify any specific case. There is no evidence that mother's case was one of the cases about which Ms. Krinsky inquired, nor is there evidence that Ms. Krinsky engaged in any such conduct in the more than two years preceding the filing of this case. Absent evidence that Ms. Krinsky actually shared or misused information that she learned from the staff attorneys, it does not appear that Ms. Krinsky's conduct presents such an intolerable risk of disclosure (Castro, *193 supra, 232 Cal.App.[3d] at p. 1444[, 284 Cal.Rptr. 154]) that, in September 2006, the juvenile court was justified in disregarding the separate existence of the three units for all purposes.
 Ms. Krinsky was copied on interoffice e-mails containing confidential information during part of 2003. Again, this practice was discontinued more than three years ago. There is no evidence that this occurred during Unit 1's (or its predecessor's) representation of mother, nor is there any evidence that any of mother's confidential information was transmitted to Ms. Krinsky.
 Ms. Krinsky transferred cases between units of the Center in 2005, allegedly in violation of section 317, subdivision (e), and allegedly fired an attorney because the attorney indicated an intent to communicate with the attorney's clients about the transfers. This allegation is irrelevant to whether disqualification is warranted in this successive-conflict case. Even if this were a concurrent-conflict case, there
 is no evidence that the alleged transfers that might have occurred in 2005 were improper, and the juvenile court made no such finding. There is no evidence that, as the result of any such transfer, the Center, any of its units, or any of its individual attorneys was disqualified, sanctioned, or disciplined, or that the professional independence of any staff attorney was compromised. Nothing in Castro, supra, 232 Cal.App.3d 1432[, 284 Cal. Rptr. 154], proscribes the transfer of cases between the Center's distinct, non-conflicted units, any more than the law prevents the transfer of cases between non-conflicted private law firms. Further, the juvenile court made no finding, express or implied, that the attorney's termination was retributive, illegal, or improper, or that her firing was anything more than an isolated event that occurred long before this case commenced.
 There was evidence that legal secretaries would work in the different units. Knowledge of confidential information, however, is not automatically imputed to or from non-lawyer support personnel. Rather, under existing California authority, the party seeking disqualification must demonstrate that the non-lawyer employee actually possesses confidential information that is material to the representation. (In re Complex Asbestos Litigation (1991) 232 Cal.App.3d 572, 595-596[, 283 Cal.Rptr. 732]; see generally, 1 Vapnek, supra, Imputed Disqualification, ¶¶ 4:221-4:222.10 at pp. 4-71 to 4-73.) California's rule is consistent with the prevailing majority rule in the United States on this point. (1 Hazard & Hodes, supra, § 14.11 at pp. 14-34 to 14-35.) There is no evidence in this case of any breach of confidence by a secretary, let alone that a secretary employed by Unit 1 in the relevant time frame actually gained knowledge of mother's material confidential information, and was subsequently transferred from Unit 1 to Unit 3 and is presently in Unit 3. Instead, the undisputed evidence is that those in the Center's support staff are advised of and expected to abide by the Center's confidentiality policies.
 A memorandum describes the Center's new administrative structure as "unified." This is irrelevant. Both Castro, supra, 232 Cal.App.3d at page 1437[, 284 Cal.Rptr. 154], and Christian, supra, 41 Cal.App.4th at page 1000[, 48 Cal.Rptr.2d 867], approve a *194 "unified" administrative structure. The relevant question is whether the Center's three legal services units operate independently in handling cases. The undisputed evidence is that, currently, they do.
 There is a central library for all three units. This, however, has always been true. There is no indication that such a library compromised confidentiality. It is common for lawyers from different firms and offices to use a common librarypublic or private.
 With respect to mother's concerns regarding the Center's "anticipate]" "transform[ation]" into a "sort of `public interest' advocacy and policy law firm," there is no indication that any advocacy or fund raising has actually interfered with the duties of competent and vigorous representation, loyalty and confidentiality owed to clients of the Center's individual units.[8]
Accordingly, the juvenile court erred by applying the incorrect legal standard, and then again when it concluded, under the wrong legal standard, that the evidence warrants disqualification in this case.
The correct legal standard to apply in a successive-conflict case involving the Center is that articulated in Jessen, supra, 111 Cal.App.4th at pp. 709-711, 3 Cal.Rptr.3d 877. (See Ochoa v. Fordel, Inc., supra, 146 Cal.App.4th at pp. 907-909, 53 Cal.Rptr.3d 277; Adams v. Aerojet-General Corp., supra, 86 Cal. App.4th at pp. 1337-1341, 104 Cal.Rptr.2d 116; see also Rhaburn v. Superior Court (2006) 140 Cal.App.4th 1566, 1573-1576, 45 Cal.Rptr.3d 464.) That standard is this: If the individual lawyer had a direct and personal relationship with the former client, then the lawyer and the lawyer's unit should be disqualified automatically, as a matter of law; when the individual lawyer had no direct and personal relationship with the former client, as in this case, but the party moving for disqualification presents evidence that the Center's ethical screens have been breached, the juvenile court should treat the Center as a single law firm for conflicts purposes only if the moving party's evidence establishes a reasonable possibility that the lawyer has actually obtained, or will inadvertently acquire, material confidential information relating to the former client's representation. The factors the juvenile court should consider include (1) the length of time that has elapsed since the former client was represented by the Center; (2) whether the prior case was particularly notorious or memorable; (3) whether the current attorney was employed by the Center at the time of the prior representation, and whether the attorney responsible for the prior representation is still employed by the Center; and (4) the nature and extent of any breaches in the Center's operating procedures established to ensure that confidential information acquired by one unit is protected from purposeful or inadvertent disclosure to lawyers in the Center's other units. This procedure represents a reasonable and effective accommodation that strikes an appropriate balance between a client's expectation of confidentiality, the integrity of the judicial system, and the public's interest in avoiding costly disqualifications of public lawyers that provide little or no benefit to either the affected clients or the orderly administration of justice.
*195 The appropriate legal standard does not warrant disqualification in this case. The record is unclear, but it appears that several years have passed since mother was represented by Unit 1 or its predecessor. There is no evidence that mother's case was so unusual or notorious that, of the thousands of cases handled by the Center since, confidential information concerning mother's case is remembered or discussed, either by the attorney who worked on it or colleagues from different units. There is no evidence that child's attorney was employed by the Center when mother's case was pending, and no evidence that the attorney who may have represented mother is still employed there. The Center has instituted formal, institutional mechanisms to prevent the dissemination of confidential client information. To the extent the evidence supports the conclusion that some of those mechanisms might have been compromised since mother's case was pending, such breaches were in the past, temporary, and sporadic, and do not give rise to a "reasonable possibility" that child's attorney in this case has acquired or will advertently be exposed to mother's confidential information.
In any litigation, disqualifying a party's attorney "imposes heavy burdens on both the clients and courts: clients are deprived of their chosen counsel, litigation costs inevitably increase and delays inevitably occur." (City of Santa Barbara, supra, 122 Cal.App.4th at p. 23, 18 Cal. Rptr.3d 403.) Courts must therefore "examine [motions to disqualify] carefully to ensure that literalism does not deny the parties substantial justice." (SpeeDee Oil, supra, 20 Cal.4th at p. 1144, 86 Cal. Rptr.2d 816, 980 P.2d 371.) These principles apply with particular force in the context of legal-services agencies. "[T]he government inevitably incurs the added cost of retaining private counsel [citation], the delay such substitution entails, and in certain types of litigation [the client] may also lose the specialized expertise of [the agency's] attorneys...." (Cobra Solutions, supra, 38 Cal.4th at p. 851, 43 Cal.Rptr.3d 771, 135 P.3d 20.) As a result, "woodenly applying [in the legal-services context] the automatic imputation rule that usually governs private law firms would be impractical and against the public interest." (1 Hazard & Hodes, supra, Government Lawyers, § 15.3 at p. 15-10.)

DISPOSITION
The juvenile court's order of disqualification is reversed.
ARMSTRONG, J., concurring.
I concur.
I agree with the lead opinion's analysis of the facts with reference to Castro v. Los Angeles County Bd. of Supervisors (1991) 232 Cal.App.3d 1432, 284 Cal.Rptr. 154. I also agree with the lead opinion's conclusion: the evidence presented by Shadonna cannot be read to support a finding that CLC meaningfully departed from the practices approved in Castro and operated as one law firm.[1] Disqualification was thus *196 improper and the disqualification order must be reversed.
I write separately for two reasons. First, the lead opinion reflects the theories advanced in Rhaburn v. Superior Court (2006) 140 Cal.App.4th 1566, 45 Cal. Rptr.3d 464, which held that the usual rules applicable to successive representation conflicts of interest and vicarious disqualification of law firms (Flatt v. Superior Court (1994) 9 Cal.4th 275, 283-284, 36 Cal.Rptr.2d 537, 885 P.2d 950; City and County of San Francisco v. Cobra Solutions, Inc. (2006) 38 Cal.4th 839, 847, 43 Cal.Rptr.3d 771, 135 P.3d 20) do not apply to criminal cases, at least when representation is by the public defender. I cannot agree that Rhaburn or the Rhaburn "factors" have any application here.
Given that CLC operated as three separate firms, Rhaburn, which concerned one firm, is irrelevant. Moreover, Rhaburn depends on assumptions which I do not believe we can make. I see nothing in the record which would allow us to assume that CLC has a high turnover, or that CLC lawyers do not remember their cases or talk about them with their colleagues. (Rhaburn, supra, 140 Cal.App.4th at p. 1579, 45 Cal.Rptr.3d 464.) Nor can I see that if CLC were found to have a conflict in this case, and thus be disqualified, any client would be deprived of counsel with the necessary expertise or that public funds would be wasted. (Id. at p. 1580, 45 Cal.Rptr.3d 464.) Neither do I see that we are free to weaken the protections the law relating to conflicts provides to clients, merely to save money. In disqualification cases, "[t]he paramount concern must be to preserve public trust in the scrupulous administration of justice and the integrity of the bar." (People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc. (1999) 20 Cal.4th 1135, 1145, 86 Cal. Rptr.2d 816, 980 P.2d 371.) This is no less true when counsel are court-appointed and publicly paid, and when the representation is of children. To the contrary, children are particularly unable to police conflicts or to otherwise protect themselves.
Shadonna was represented by a CLC lawyer when she was a vulnerable child, and when she was a vulnerable child-mother. If a private lawyer had undertaken that representation, another lawyer in that lawyer's firm could not, a year later, represent her adversary, Charlisse, in this closely related case. That would be the rule if Shadonna was a business, institution, or investor. I see no need to weaken the rules because she was a child.
This brings me to my next point. There was evidence that CLC's former Executive Director attempted to direct strategy in individual cases not in order to advance the interests of the client, but to advance the interests of CLC. I do not see that this is evidence that CLC operated as one firm, but I do see a real problem, and I feel constrained to comment.
It is axiomatic that a lawyer must advocate for the client, not the lawyer or any law firm or institution the lawyer is affiliated with. I take quite seriously Shadonna's argument that things will worsen for CLC clients in this regard, given that CLC now raises money from outside sources *197 and, at least according to some of the information in the record, plans to become not just a law office but a "child advocacy" organization. I note that CLC's own website announces that it not only represents clients, but works for "system reform" to "bring about far-reaching changes," by sponsoring legislation, taking public positions, and other activities.
It is easy to see that, as Shadonna argues, private funding could give CLC an incentive to skew day-to-day representation of cases to further its advocacy goals or please its funders. A CLC position on what is good for children could influence a lawyer's decision on managing a case for a particular child, and CLC's desire to maintain itself as an institution could have a similar effect.
In fact, the danger exists even in the absence of private funding. Shadonna presented evidence that after a CLC lawyer subpoenaed a DCFS employee, CLC's Executive Director asked the lawyer to quash the subpoena and when that lawyer refused, repeatedly made the same request of the supervisor. The Executive Director was frank about her motivation for so attempting to influence client representation: the dependent child was a plaintiff in a Federal class action then pending, CLC was involved in that litigation, and the Executive Director thought it would "not look good" if CLC was not cooperating with DCFS.
The evidence on the Code of Civil Procedure section 170.6 policy is similar. The former Executive Director attempted to limit lawyers' ability to file affidavits, in order to advance the "interests of CLC as an entity."
The lead opinion would minimize this problem by casting CLC as a "public interest law firm." There is a critical difference. A public interest law firm may choose cases and clients in accordance with its announced goals, and litigate to further those goals. The clients, too, have a choice. If the law firm's goal is not the client's goal, the client can go elsewhere. CLC does not choose its cases, but is instead appointed by the court to represent clientschildrenwho know nothing of CLC's advocacy goals, and have no say in choosing counsel.
This is a particularly sensitive point because counsel for children in dependency cases have powers and responsibilities which are in my experience unique in the law. Children, particularly young children, are by virtue of their age unable to act as clients normally do. Their lawyers will necessarily be more personally involved and have more to say about litigation goals. Indeed, those lawyers are directed to advocate for the child's physical and emotional well-being. (Welf. & Inst. Code, § 317.) They may be the holder of a client's privileges [2] (Welf. & Inst.Code, § 317, subd, (f)), and in some cases may advocate positions contrary to the client's express wishes. (In re Alexis W. (1999) 71 Cal.App.4th 28, 83 Cal.Rptr.2d 488; Welf. & Inst.Code, § 317, subd.(e).) Great care must be taken to insure that the lawyer's decisions are made solely to benefit the clientone client at a timeand not the institution. "Child advocacy" and advocating for an individual client are not the same thing.
TURNER, P.J., dissenting.

I. INTRODUCTION
I respectfully dissent from the holdings of the lead and concur ring opinions that *198 reverse the order disqualifying the Children's Law Center (the center) from representing the child, Charlisse C. I believe the juvenile court did not abuse its discretion when it granted the disqualification motion. The juvenile court reasonably could have found that while the center represented the mother, Shadonna C, the ethical restrictions imposed on a nonprofit legal services corporation recognized in Castro v. Los Angeles County Bd. of Supervisors (1991) 232 Cal.App.3d 1432, 1435-1445, 284 Cal.Rptr. 154 were materially violated and, under established successive representation rules, disqualification was warranted. I agree though with the lead opinion that the center has standing to challenge the disqualification order.

II. BACKGROUND

A. The Contracts
The center is a non-profit legal services organization which was created in 1989 by the County of Los Angeles to provide legal services to parents and children in the dependency court. The center was originally created under the name Dependency Court Legal Services, Inc. in order for the county to develop an economical and cost effective means to provide representation when legal services are required under Welfare and Institutions Code[1] section 317. The legal services were subsequently provided by a contract between Dependency Court Legal Services, Inc. with the Los Angeles Superior Court. The January 22, 1990 agreement between Dependency Court Legal Services, Inc. and the Los Angeles County Board of Supervisors specifically recognized that conflicts would periodically arise when several parties to a dependency proceeding required independent counsel. As a result, the January 22, 1990 agreement required Dependency Court Legal Services, Inc. to maintain a structure which would allow up to three independent attorneys to be assigned to represent different parties in each proceeding.[2] As previously noted, Dependence *199 Court Legal Services, Inc. was later renamed as the center.
On July 1, 2005, the center contracted with the Administrative Office of the Courts to provide the dependency representation. Section B.2 of the July 1, 2005 agreement provides: "[The center] will ensure that conflicts are declared after appointment only when an actual conflict exists and shall similarly accept new appointments consistent with conflict rules and laws. [¶] 1. New Appointments: [¶] [The center] shall establish procedures to check for conflicts of interest, and shall decline appointment of new clients who present a conflict of interest with their present clients. [¶] 2. Ongoing Clients: [¶] [The center] shall establish procedures to determine whether actual conflicts of interest arise among current clients, including within sibling groups, and shall advise the Court when such conflicts arise and seek to be relieved of appointment in such cases, when and if required by law." The aforementioned "Operating Rules and Procedures" from the January 22, 1990 agreement with the Los Angeles County Board of Supervisors were (see fn. 2, supra) not referenced in the July 1, 2005 contract with the Administrative Offices of the Court. As will be noted, at the time the disqualification motion was filed and ruled upon, the center was divided into three litigation units: a core unit, also referred to as unit 1; unit 2; and unit 3.

B. The Filing Of The Dependency Petition And The Detention Proceedings
On July 26, 2006, the Los Angeles County Department of Children and Family Services filed a dependency petition on behalf of the child. The petition alleged that the child, who had been born in July 2006, was at substantial risk of being abused or neglected because of the 19year-old mother's emotional and mental health problems including significant depressive symptoms. The petition further alleged that, at the age of 14, the mother gave birth to a sibling, Donna C, born in January 2002, another child who had been adjudicated a court dependent. The older sibling, Donna, had ultimately been adopted by a grandparent. The detention report stated that the mother was a former foster youth. The mother admitted using marijuana and cutting her wrists. This occurred while the mother was pregnant with the child. The mother was described as defensive, angry, and withdrawn.
At the detention hearing on July 26, 2006, Katie Baca was appointed to represent the mother. Ms. Baca was formerly employed as an attorney by the center. Ms. Baca advised the juvenile court there was a conflict of interest in that unit 2 had previously represented the older sibling, Donna, who had been adopted by a grandparent. In response, the juvenile court then appointed Linda Jackson, from unit 3 of the center, to represent the child. Ms. Baca, the mother's counsel, then objected to Ms. Jackson's appointment on conflict of interest grounds. Ms. Baca argued: "Based on the appointment of Ms. Jackson I would be objecting that there's a conflict of interest in that her firm should not be appointed to represent the new baby. In light of [City and County of San Francisco v. Cobra Solutions, Inc. (2006) 38 Cal.4th 839, 847-854, 43 Cal.Rptr.3d 771, 135 P.3d 20] that just came down which *200 verified that the [Castro] model is the approved model for dependency court. I would indicate the [center] structure has been greatly changed and is in [an] amorphous stage, at this point, and that they are operating as one firm. [¶] And, in addition, the mother was a [center] client of unit one when she was a child herself and she is not waiving any conflict and I did go over that with mother. In fact, she was concerned about that issue herself." The juvenile court replied that there was no factual conflict of interest because: the mother had been previously represented by the center's unit 1; the older sibling, Donna, who had been adopted by a grandparent, had been represented by the center's unit 2; and the child would be represented by the center's unit 3. The juvenile court, however, noted that there was a possibility of a legal conflict.

C. The Papers Filed In Support And Opposition To The Disqualification Motion

1. Overview
I do not agree with the lead opinion's synopsis of the facts. Therefore, because the present case involves an abuse of discretion standard of review, it is appropriate to set forth all of the facts presented by all of the parties. Thereafter, I will synthesize those facts which support the juvenile court's exercise of its discretion.

2. The moving papers
On August 18, 2006, the mother filed a written motion to disqualify the center and its unit 3 as counsel of record for the child. The mother's attorney, Ms. Baca, was a lawyer who formerly worked in unit 2 of the center. Ms. Baca left the center to work as a panel attorney. A panel attorney accepts appointments pursuant to section 317 and is not affiliated with the center. As noted, unit 3 of the center was appointed to represent the child. The mother's disqualification motion sought to require that the child be represented by an attorney not affiliated with the center. The notice of motion alleged, "This motion is based upon the grounds that the [center] is operated as one law firm and represents clients with adverse interests, in violation of its ethical duties to its clients." In support of the motion, Ms. Baca filed a declaration which she subsequently withdrew. The juvenile court later explicitly stated it had not read Ms. Baca's declaration. Without Ms. Baca's declaration, the moving papers make very little sense. But many of the relevant facts are filled in by the other papers filed by the parties.
Allen Korenstein also filed a declaration, which was not withdrawn, in support of the mother's written disqualification motion. Mr. Korenstein was a former staff attorney with the Law Offices of Kenneth P. Sherman, which is the predecessor of unit 2 of the center. Mr. Korenstein was employed from May 17, 2004, through March 2006. He was employed there during the restructuring process which occurred while Miriam Krinsky was the executive director. Mr. Korenstein witnessed the transfer of a unit 2 secretary to unit 1 without any checks or screens. Because of the current merger of the three firms, unit 2 was forced to cover more courtrooms than it could competently handle. Mr. Korenstein requested that the unit 2 firm head approve funding for an expert witness to review a case and possibly testify in court. Mr. Korenstein's firm head directed that the funding request be forwarded to Lisa Mandell. Ms. Mandell was formerly the unit 1 firm head.
The mother also attached a copy of an October 20, 2005 memorandum directed to all of the center's staff from Ms. Krinsky and the three unit heads. The October 20, 2005 memorandum stated the center was making "slight revisions" to the operating *201 procedures to protect and preserve ethical walls. The revised operating procedures differed in some ways from the January 1990 operating procedures. The most important change was that center was counsel for all of the children. In the past, the three separate law firms had been appointed to represent clients.[3]
The mother's points and authorities argued the center had abolished the independence of the three law firms. According to the mother, the center was operating as one law firm, which violated minimal ethical duties owed to its clients. The mother's points and authorities argued: "[T]here is an actual conflict between the *202 mother and the child.... [M]other objects to the [center] representing her child or taking any position adverse to the mother." Citing City and County of San Francisco v. Cobra Solutions, Inc., supra, 38 Cal.4th at pages 851-853, 43 Cal.Rptr.3d 771, 135 P.3d 20, the mother argued that an attorney could not ethically take a position adverse to a former client. The mother also argued that the center should be disqualified because it breached its continuing duty of loyalty to her as a former client. The breach of the continuing duty of loyalty occurred because the center represented another client, the child, in the present dependency action involving a former client, the mother.

3. The opposition
On September 5, 2006, the center filed an opposition to the disqualification motion. The center's opposition was filed after Ms. Baca withdrew her declaration. The center argued: the disqualification motion lacked evidentiary support because Ms. Baca withdrew her declaration; the exhibits attached to the motion were not authenticated; Mr. Korenstein's declaration was insufficient to establish either the operating procedures or purported ethical violations of the center; and the center's structure and operating procedures closely complied with the standards set forth in: Castro v. Los Angeles County Bd. of Supervisors, supra, 232 Cal.App.3d at pages 1435-1445, 284 Cal.Rptr. 154; People v. Christian (1996) 41 Cal.App.4th 986, 991-1002, 48 Cal.Rptr.2d 867; and City and County of San Francisco v. Cobra Solutions, Inc., supra, 38 Cal.4th at pages 847-854, 43 Cal.Rptr.3d 771,135 P.3d 20.
Attached to the opposition is the declaration of the center's executive director, Ms. Krinsky. Ms. Krinsky described the July 1, 2005 contract with the Administrative Office of the Courts. Ms. Krinsky stated, "[The] contract allows [the center] to create a structure and procedures that best enable it to attend to the needs of dependent children it has contractually agreed to represent." According to Ms. Krinsky, the respective missions of Dependency Court Legal Services, Inc., when it was originally formed in 1989, and the center were different. Dependency Court Legal Services, Inc. was originally created in 1989 to represent parents and children in dependency proceedings. However, Dependency Court Legal Services, Inc. subsequently changed its primary focus to representing children in dependency proceedings. The name, Dependency Court Legal Services, Inc., was changed to reflect the center's exclusive focus on representing children.
Ms. Krinsky further declared the center's organizational focus had shifted, for the most part, by no longer representing parents. Thus, she explained the tripartite structure of three semi-autonomous divisions became outdated and was no longer necessary to carry out the center's mission. Ms. Krinsky declared, "[The] old structure is at odds with the structure employed by other highly regarded organizations around the nation which represent children through a more unified and cohesive organization, thereby allowing for greater support for staff, more flexibility in the movement of cases and staff to allow for a more equitable distribution of cases, expanded opportunity for staff development, specialization, and growth, enhanced accountability, and a larger percentage of children represented by a single organization." According to Ms. Krinsky, prior to the change to the new organization structure, cases were not allocated between "divisions to accommodate conflicts"; rather, caseload assignment was accomplished on an ad hoc basis.
*203 Ms. Krinsky also declared that, as a result of a 2004 meeting with the juvenile court presiding judge, the center's board of directors engaged the services of a management consultant. According to Ms. Krinsky, "[The center's] Board of Directors engaged a management consultant, Jack Walker, who concluded that [the center] needed to be restructured `from three separate law firms into a more unified law firm[.]'"
Attached to Ms. Krinsky's declaration was the recommendation of Mr. Walker to the center's board of directors. Mr. Walker was retained by the center as a consultant. Mr. Walker recommended the restructuring of the three separate law firms into a "more unified law firm." Mr. Walker was "perplexed" as to why there were three separate firms. He stated, "[A]bsent a compelling reason, a professional service firm should never be divided into freestanding, separately led parts. All of the great professional service firms that I know are characterized by a `one-firm' culture and a central administration ... with everyone on the same team." In Mr. Walker's view, among the advantages of unifying were: securing private funding; the recruitment of future leaders; the reduction of internal dissention within the center; allowing the attorneys to handle more cases; utilizing investigators and social workers in a more effective fashion; developing specialization; better training; uniformity in compensation; and the ability to act as an advocacy organization. In terms of conflicts of interests, Mr. Walker stated: "Sibling conflicts will always exist, however, and [the center] management must insure that, as restructuring is effected, current and future conflicts will be handled in an ethical manner without undue harm to clients. I use the word `undue' because perfection in these matters is never possible." Mr. Walker identified two obstacles to unificationconflicts and opposition by center lawyers to the change. According to Ms. Krinsky, the center's board concurred in Mr. Walker's recommendations.
Thereafter, the center performed a caseload study. According to Ms. Krinsky, over three-fourths of the center's caseload involved no conflicts at all. The center was restructured after a March 8, 2005 board of directors memorandum was circulated. The memorandum stated in part, "[The board of directors] has concluded that the best interests of [the center] and its clients will be served by moving [the center] to a unified and more cohesive organizational structure." One firm was to be designated the "core firm"unit 1. There would also be "conflict units"units 2 and 3. The March 8, 2005 memorandum to the center staff from its board of directors stated: "Significantly, both the Board's ethics counsel and its management consultant endorse the movement to a new unified structure. Our ethics counsel has confirmed that no ethics rules or cases compel our current structure." The board of directors' March 8, 2005 memorandum uses phrases such as: "transition to a new unified structure"; "benefits will flow from a cohesive organizational structure"; the center's "unified entity"; and "move the organization in the direction of a unified structure." Further, the March 8, 2005 board of directors' memorandum expressly states that lawyers will be moved from conflict firms to the core unit.
Ms. Krinsky declared the center strictly adhered to the aforementioned October 20, 2005 operating procedures and enforced the existing ethical walls. Ms. Krinsky denied that: she or other executive officers, attorneys, or staff from the core unit (unit 1) had access to case files in the conflicts units (units 2 and 3); unit 1 leadership and attorneys had access to client confidential information relating to units 2 *204 or 3 cases; or unit leadership had involvement in case-specific decisions or supervision of those cases. Ms. Krinsky denied that attorneys working in units 2 or 3 needed to obtain her approval or of unit 1 before paying ordinary trial expenses such as retaining expert witnesses. However, unit 2 or 3 extraordinary expenses may need her approval in order to ensure that the center operated within its budgetary limitations. Ms. Krinsky stated that, in evaluating an extraordinary expense request, neither she nor her staff inquired into the specific facts of any case or obtained confidential information.
In terms of employment practices, Ms. Krinsky referred to the October 20, 2005 center operating procedures. (See fn. 3, supra.) Ms. Krinsky's declaration described what she considered her authority to be with respect to hiring, discharging, and promoting staff. According to Ms. Krinsky, under the old and new procedures, as executive director: she had final authority upon the recommendation of the unit heads with regard to promoting, terminating, or disciplining lawyers or staff members; she had authority over the budget and allocation of funds in relation to operating costs; and she had authority over hiring decisions and assignment of lawyers to particular units.
Ms. Krinsky stated: "As was the case under the old Operating Rules and Procedures affirmed by the Court of Appeal in Castro, Ias [the center's] Executive Directorhave final authority, upon the recommendation of the [center] Unit Heads, with regard to promoting, terminating, or disciplining [the center] lawyers or staff members. In addition, as under the old Operating Rules and Procedures, Ias [the center's] Executive Directorhave authority over the [the center's] budget and how funds get allocated in relation to [the center's] operating costs. I also have, as under the old Operating Rules and Procedures, authority over hiring decisions, and assignment of lawyers to particular [the center's] units."
Ms. Krinsky admitted there had been a policy in place regarding the exercise of blanket peremptory challenges. But she explained the policy did not constrain the exercise of challenges to particular cases, which remained the prerogative of individual attorneys under the unit heads' supervision. Ms. Krinsky admitted that secretaries were moved between units. But Ms. Krinsky stated the practice of secretaries working in different units was in place when she became the executive director. That practice remained in effect. Ms. Krinsky stated she directed that the secretaries be advised of the need to preserve client confidences. Ms. Krinsky also declared that she was unaware "of any material breaches" of the center's operating procedures, ethical walls, or conflicts policy.
David Estep declared that he was head of the core unit or, as it was also called, unit 1. According to Mr. Estep, the center strictly enforced ethical walls among units 1, 2, and 3 and the executive leadership. (Formerly, the person responsible for administering a unit was called a director. After the center's reorganization, a director was referred to as a unit head.) Mr. Estep denied that either he, the executive officers, or any core unit attorneys have access to conflict units cases. Mr. Estep agreed that secretaries continued to move between the units as had occurred in the past. Ms. Krinsky underscored the need to ensure that the secretaries were advised of and abided by the rules concerning the preservation of client confidences and the maintenance of ethical walls.
Marc Leftwich, the unit 2 head, concurred that the ethical walls were maintained. *205 As to Mr. Korenstein's assertion that an expert witness funding request was forwarded to Ms. Mandel, the former unit 1 director, Mr. Leftwich declared, "Mr. Korenstein does not identify the case or client involved, but my recollection is that the request was for an extraordinary expense and that the decision not to hire this particular expert witness was made independent of cost and based on strategic reasons related to the specifics of the case and discussed only, with and among [unit 2] attorneys and supervisors." (Original italics.) Mr. Leftwich further declared that he had complete autonomy in funding ordinary trial expenses consistent with the limitations of the unit 2 budget. The unit 3 head, Ivy Carey, declared that the center strictly enforces the ethical walls in place among units 1, 2, and 3 and the executive leadership. She denied being aware of material breaches of the operating procedures, ethical walls, or conflicts policy.

4. The mother's reply
On September 18, 2006, the mother filed a written reply to the center's opposition. The mother submitted declarations from several former center employees. Kenneth P. Sherman declared that he joined Dependency Court Legal Services, Inc. in 1990 as a senior trial attorney. Mr. Sherman declared that Dependency Court Legal Services, Inc., the center's predecessor, was created with three separate law firms along with one administrator. Mr. Sherman declared, "Since [Ms.] Krinsky was first hired as executive director, she repeatedly violated the ethical walls required by case law, statute and the bylaws of the corporation." In September 1997, Mr. Sherman became a law firm director. Ms. Krinsky was hired as the center's executive director in April 2002. Mr. Sherman and Anne Fragasso, another law firm director, repeatedly spoke with Ms. Krinsky about confidentiality and independence issues. Ms. Krinsky was repeatedly reminded that she could not breach confidentiality and she was required to respect the independence of the three law firms.
Mr. Sherman declared that, in January 2003, Ms. Krinsky intervened in one of the cases in his office. Ms. Krinsky requested that one of his attorneys representing a dependent child "quash" a subpoena for an employee of the Department of Children and Family Services. The child was the subject of a federal class action. The attorney representing the child refused to "quash" the subpoena. Ms. Krinsky then spoke to one of Mr. Sherman's supervisors and requested that the attorney "quash" the subpoena. The supervisor refused to do so. Mr. Sherman discussed the matter with Ms. Krinsky including the fact that she knew of the existence of the subpoena. Mr. Sherman declared: "Ms. Krinsky attempted to convince me that I should cause my attorney to quash the [subpoena]. Her basis for this request was that [the center] was involved in the [federal class action] litigation ... and it would not look good if it appeared that [the center] was not cooperating with the Department. I responded to this argument by explaining to Ms. Krinsky that it was my duty as the attorney of record for this child to zealously advocate for her best interests. Even after I explained my ethical responsibilities to my client, Ms. Krinsky continued to attempt to convince me to have the [subpoena] quashed."
Mr. Sherman further declared that in spring 2003, in his presence, Ms. Krinsky asked fact specific questions of one of his lawyers representing a dependent child. According to Mr. Sherman, the nature of the questions made it clear that Ms. Krinsky had knowledge of many of the facts of the particular case. Mr. Sherman subsequently discovered that Ms. Mandel, the *206 unit 1 head, represented a sibling with a conflicting interest.
Mr. Sherman also declared: "In approximately June of 2003 it was discovered that Ms. Krinsky had surreptitiously had our computer administrator put her [e-mail] address on each of the intraoffice confidential [e-mails] of the three law firms. These intraoffice [e-mail] lists were intended to be distribution lists for the staff within each office in order to ensure that there was no breach of confidentiality when information about cases was transmitted within the office. It was only discovered that Ms. Krinsky had had herself included on these lists when one of the law firm directors sent out an [e-mail] to her office and an `auto reply' was received indicating that Ms. Krinsky was out of the office. When informed of the impropriety of this breach of confidentiality, Ms. Krinsky explained that she thought it was important for her as the head of [the center] to know what was being discussed within each of the three offices. When she was informed of the breach of confidentiality and how this act could endanger the viability of the corporation, she relented and permitted the three firms to maintain intraoffice confidential [e-mail] address lists."
In fall 2003, one of Mr. Sherman's attorneys began filing Code of Civil Procedure section 170.6 affidavits in the courtrooms where the lawyer was assigned. Ms. Krinsky subsequently imposed a policy in all three offices that required her approval before an affidavit of prejudice could be used on a "`blanket'" basis or in a "`class of cases.'" Mr. Sherman attempted to explain to Ms. Krinsky that she was creating divided loyalties and subjecting the clients to the possibility of a court finding the three firms had conflicts of interests. Ms. Krinsky suspended the policy about a year later when Mr. Sherman provided her with an opinion from an "ethics expert."
In spring 2005, an attorney left Mr. Sherman's law firm. Ms. Krinsky made the decision to transfer those cases to the "`core'" firm headed by Ms. Mandel. In other words, the clients where Mr. Sherman's firm had been provided representation would now be represented by lawyers working in Ms. Mandel's firm. Mr. Sherman advised Ms. Krinsky that pursuant to section 317, subdivision (d) there had to be: notice to the client; an opportunity for the client to be heard; and a court order permitting the substitution. However, Ms. Krinsky felt it was unnecessary because the center was counsel for the children. Mr. Sherman then responded that the center was never appointed as counsel for any of the children. Rather, the court orders stated the following firms were appointed: CLC1, the Law Firm of Lisa Mandel; CLC2, the Law Firm of Kenneth P. Sherman; and CLC3, the Law Firm of Anne E. Fragasso. According to Mr. Sherman, Ms. Krinsky pursued transferring cases at will among the three firms.
Mr. Sherman also disputed Ms. Krinsky's estimate of cases which had conflicts. Mr. Sherman stated that his survey revealed 25 to 50 percent of the cases involved conflicts of interest. Ms. Krinsky declined to undertake a survey that would accurately calculate the statistical data in each of the three law firms in order to obtain accurate figures as to the percentages of cases where conflicts of interests required the appointment of separate counsel.
Finally, Mr. Sherman declared: "Many times [Ms.] Krinsky has indicated to me that she felt that the interests of the organization as a whole [were] paramount to the interests of the law firms. I informed her on many occasions that her actions endangered the viability of the corporation and compromised the ethical and legal obligations that the law firm directors owed *207 to their clients.... Ms. Krinsky never acknowledged ... the impropriety of her actions."
The mother also submitted Ms. Fragasso's declaration. Ms. Fragasso stated that she was an employee of the center or its predecessor from the middle of 1999 until the middle of 2005. She became a law firm director after Randall Pacheco left. After Ms. Krinsky became executive director, the three law firm directors were concerned about action taken by the center. Ms. Fragasso declared: "Each law firm had an intra office e-mail address list. In early summer of 2003, I discovered that Ms. Krinsky had included herself in each of these lists without informing the law firm directors of her action. I discovered that she had done so when an e-mail that I had thought was confidential, and which I had sent using the long established list of employees in my firm, was answered by Ms. Krinsky's out of office auto reply. Initially, I thought an error had been made but, when I checked the lists, I found her name had been included in each of them. When Ms. Krinsky returned to the office and Lisa Mandel and I informed her of our concern, she was initially defensive and dismissive of our concern and said we should have told her we had these lists. Upon further reflection, however, she agreed that she should not be reading confidential intra office e-mail within each firm."
In terms of peremptory challenges, Ms. Fragasso declared, "Ms. Krinsky announced ... that she would be the final decision maker when it came to the exercise of peremptory challenges by lawyers in each of the three firms whenever such challenges were in the form either of a blanket challenge of a particular bench officer or a class of cases." Ms. Fragasso and Mr. Sherman at their own expense consulted an "ethics expert" who concluded the policy was unlawful. Shortly after Ms. Krinsky consulted outside counsel, the policy was withdrawn.
In the spring of 2005, staff was informed that the center's board of directors had decided the three law firms would collapse into one core firm. Attorneys leaving the Sherman and Fragasso firms would not be replaced but their cases would go to the core firm headed by Ms. Mandel. Ms. Fragasso spoke to Ms. Krinsky and Ms. Mandel. In that conversation, Ms. Fragasso expressed "grave concerns about the lawfulness" of the planned reorganization. Under the plan, Ms. Fragasso's cases would be returned to the control of the "`core'" firm. As noted, Ms. Fragasso was counsel of record. Ms. Fragasso felt she was obligated to confer with her clients and advise them of their rights. Further, Ms. Fragasso stated it was necessary the court relieve her as counsel of record. Ms. Krinsky stated that the litigants were not Ms. Fragasso's clients but those of the center. Ms. Krinsky stated she "had already changed" the contract with the superior court which "permit[ted] her to create whatever structure" as the executive director she deemed appropriate. Ms. Krinsky then produced the contract with the Administrative Office of the Courts. According to Ms. Fragasso, "The new contract contained none of the language approved in Castro that allowed [the center] to represent multiple clients."
As noted, Ms. Krinsky indicated that Ms. Fragasso's concerns were unwarranted because the clients belonged to the center. Ms. Fragasso indicated that she believed that Castro was the controlling authority of law and that the ethical walls between the law firms needed to remain. Ms. Fragasso stated, "Ms. Krinsky told me that speaking to my clients privately and requesting the court to relieve me as counsel [was] not only unnecessary but would *208 be harmful to my clients." Ms. Fragasso refused to transfer the cases unless she was permitted to speak to the clients in confidence, to obtain their input, and to be relieved by the court as a counsel of record. After expressing these concerns, Ms. Fragasso was removed as a law. firm director.
Angela Pierce di Donato declared that she formerly was a unit 2 attorney. Ms. di Donato had been employed in the Law Offices of Robert Stevenson beginning in December 1996. When she was hired, Ms. di Donato met with the Executive Director of Dependency Court Legal Services, Inc., Ed Gilmore, and discussed salary and benefits. Thereafter, Mr. Gilmore never discussed any case or client with Ms. di Donato. When Mr. Stevenson became a superior court referee, Mr. Sherman became the new firm director. The firm was known as the Law Office of Kenneth P. Sherman. When Mr. Stevenson left, Mr. Sherman became the counsel of record on each of Ms. di Donato's cases. Ms. di Donato left Mr. Sherman's firm in January 2005 and became a panel attorney.
One evening Ms. Krinsky came into Ms. di Donato's office at about 6 p.m. According to Ms. di Donato, Ms. Krinsky came into unit 2 through a door that had been locked and needed a key for access. The door was not open to the public. Ms. di Donato's case files were spread out on the office file. Ms. di Donato declared: "I told her that I was working on a difficult case that needed more attention. She asked me about the facts of the case and what work I was doing on it. She asked me questions about my client and what was going on in court."
While she was employed in unit 2 and its predecessor law offices, Ms. di Donato identified the percentage of her "files" in department 411, the courtroom she worked in, where the client had previously been represented by another unit. Less than half her "cases" involved clients who had previously been represented by one of the other center law firms. Because she was dissatisfied with the accuracy of her count, Ms. di Donato had staff in the Mandel and Fragasso firms run her case numbers through their databases. Ms. di Donato declared, "I was very surprised to learn that 2/3 of my cases had parties that had been represented by one or both of the other [center] firms."
In late November 2004, Ms. di Donato decided to leave the center to work as a panel attorney. Ms. di Donato wanted to keep 15 cases. Ms. Krinsky said the cases belonged to the center. Ms. Krinsky said she would decide which cases could be taken. Ms. di Donato had to explain the facts of each case to Ms. Krinsky. Ms. Krinsky then made a decision as to each case. Ms. di Donato was only permitted to keep two child clients but Ms. Krinsky made Ms. di Donato explain the facts of those cases.

5. The center's additional response
In a supplemental written submission, the center noted it was being sued by Mr. Sherman and Ms. Fragasso. Mr. Sherman was terminated on May 19, 2005. Ms. Fragasso was terminated on June 30, 2005. The center also asserted: there was no evidence that any client confidential information relating to this case or this client had been passed between units; client confidences had been maintained; and ethical walls between the units remained in effect.
Ms. Krinsky filed an additional declaration in which she denied receiving any confidential information or exercising any control over this case. She declared: "The Response asserts that I may have a key to the office spaces occupied by [units 2 and 3]. I honestly do not know whether *209 or not I have any such keythe keys I possess were given to me by our [human resources] director when I started at [the center]...." She denied using a key to access the office spaces of units 2 and 3 or any confidential files. Ms. Krinsky explained the practice of having a common law library was in place before she arrived at the center. Ms. Krinsky explained, "I did at that time include myself as Executive Director on [e-mail] groups I hadn't previously been aware of in order to be kept apprised of general office [e-mail] discussions of events, issues of common concern, or other non-case specific matters via [e-mail]."
As to the late night meeting in Ms. di Donato's office, Ms. Krinsky stated: "I have no specific recollection of this conversation taking place, but I recall a late-night 'rapport-building' conversation between Ms. di Donato and myself, in which Ias the new [center] Executive Director sought to listen and show an interest in what was on the mind of one of [the center's] line attorneys. (This is the first time that Ms. [di] Donato, Mr. Sherman, or any other [center] supervisor has expressed concern in regard to that conversation.) I have never forced any [center] lawyer to discuss a conflict case or reveal client confidential information...."
As to the meeting when Ms. di Donato was leaving the employ of the center, Ms. Krinsky declared: "During these discussions ... no client confidential information was ever passed to me. I was only seeking to obtain basic information that would help in deciding whether the case and Ms. di Donato's relationship with the client was sufficiently unusual to justify an exception to the. {center] rule and practice that on departure of an attorney, [center] clients continue to be represented by [the center]."
Ms. Carey declared that as the head of unit 3, she opposed the disqualification motion. Ms. Carey denied being pressured or compelled to do so by Ms. Krinsky or anyone else. Ms. Carey declared that she had "full autonomy with regard to representing" the child in this case.

D. The Jurisdiction/Disposition Report Filed September 8, 2006
The Jurisdiction/Disposition report filed September 8, 2006, which was in the juvenile court file and had been received in evidence when the disqualification motion was granted on September 22, 2006, described the mother's prior dependency litigation while she was represented by the center. When she was 14 years old, which was in 2001, the mother was placed in St. Anne's Maternity Home. On April 17, 2002, the department received reports that the older sibling, Donna, was subject to emotional abuse. These initial abuse reports were made when the mother was 15 years old and while a center client. On April 17, 2002, the mother signed a voluntary family maintenance agreement with the department. On June 4, 2002, Donna was detained in response to sustained allegations of physical abuse and general neglect. The mother received family reunification services for Donna from June 4, 2002, through December 18, 2003. Permanent placement services were provided from December 18, 2003, though January 26, 2005. Donna was adopted and jurisdiction was terminated on February 17, 2005. The mother turned 18 on March 18, 2005.
The mother explained the failure to reunify with Donna thusly: "`Yes. She (Donna) was permanently placed. She was in legal guardianship at first, then all of a sudden she was adopted. I don't know what they (Court) was talking about. I finished my parenting and anger management, but they also wanted me to go to a *210 grief and loss class and I never did that, so maybe that's why they said I didn't reunify with her.'" The mother explained that some of her depression stemmed from the fact she was placed in foster care. The mother was also depressed because of the failure to reunite with Donna. The department social worker believed the mother's failure to reunite with Donna may have been due to immaturity. The social worker noted that Donna was born when the mother was only 14 years old.

E. The September 22, 2006 Hearing
At the disqualification motion hearing on September 22, 2006, the mother renewed her objection to the participation of the center in the proceeding. The juvenile court overruled the objection indicating that Ms. Baca failed to submit points and authorities on the standing issue. The juvenile court gave a lengthy tentative analysis that consumes seven pages of the reporter's transcript as to why it thought the disqualification was warranted. The juvenile court stated: any restructuring by the center must maintain ethical walls and avoid dissemination of privileged communications; the controlling cases were Castro v. Los Angeles County Bd. of Supervisors, supra, 232 Cal.App.3d at pages 1435-1445, 284 Cal.Rptr. 154 and People v. Christian, supra, 41 Cal.App.4th at pages 991-1002, 48 Cal.Rptr.2d-867; the decision of City and County of San Francisco v. Cobra Solutions, Inc., supra, 38 Cal.4th at pages 847-854, 43 Cal.Rptr.3d 771, 135 P.3d 20 was irrelevant for a variety of reasons; the center's reorganization plan with a core unit and two conflict units was appropriate unless the ethical walls mandated by Castro were "in practice" violated; there were "internal politics" within the center that were at play; "I get the impression that [the center] says one thing and does something else"; it was concerned about Ms. Krinsky's intrusion into the computer systems; Ms. Krinsky retained final authority over personnel issues in a manner different from that that present in Castro; the contract between the board of supervisors and Dependency Courts Legal Services, Inc. permitted the executive leadership the authority to promote, discipline, or dismiss staff employees "only upon the recommendation" of the law firm director; but Ms. Krinsky (or her designee), after considering a unit head's recommendation, had the final authority over all personnel decisions; the center's own statistics indicated that 18 percent of the case involved conflicts of interest, a figure disputed by the mother's declarations; and the ethical walls maintained by Castro had been violated. The juvenile court concluded, citing to the following language in Castro v. Los Angeles County Bd. of Supervisors, supra, 232 Cal. App.3d at page 1444, 284 Cal.Rptr. 154, "`The question, therefore, is not whether a lawyer in a particular circumstance "may" or "might" or "could" be tempted to do something improper, but whether the likelihood of such a transgression, in the eye of the reasonable observer, is of sufficient magnitude that the arrangement or representation ought to be forbidden categorically.' " The juvenile court then took a recess so as to allow parties an opportunity to digest its tentative views.
The juvenile court stated that it would be willing to grant an evidentiary hearing before ruling on the matter. The center's counsel declined the offer for an evidentiary hearing and submitted on the tentative ruling. The juvenile court granted the disqualification motion but stayed the order for one week. The center filed a notice of appeal on October 13, 2006.

III. Discussion

1. Standard of Review
In People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc. *211 (1999) 20 Cal.4th 1135, 1143-1144, 86 Cal. Rptr.2d 816, 980 P.2d 371, our Supreme Court set forth the standard of review for a disqualification motion as follows: "Generally, a trial court's decision on a disqualification motion is reviewed for abuse of discretion. [Citations.] If the trial court resolved disputed factual issues, the reviewing court should not substitute its judgment for the trial court's express or implied findings supported by substantial evidence. [Citations.] When substantial evidence supports the trial court's factual findings, the appellate court reviews the conclusions based on those findings for abuse of discretion. [Citation.] However, the trial court's discretion is limited by the applicable legal principles. [Citation.] Thus, where there are no material disputed factual issues, the appellate court reviews the trial court's determination as a question of law. [Citation.] In any event, a disqualification motion involves concerns that justify careful review of the trial court's exercise of discretion. [Citation.]" (See also City and County of San Francisco v. Cobra Solutions, Inc., supra, 38 Cal.4th at p. 848, 43 Cal.Rptr.3d 771, 135 P.3d 20.)
Contrary to the center's argument, this order under review is not subject in its entirety to de novo review. Many of the factual issues are disputed. For example, Ms. Krinsky's declarations assert no violation of ethical walls has occurred. By contrast, the declarations submitted by the mother dispute Ms. Krinsky's denials in wide-ranging respects. No doubt, some matters are undisputed but as to others, the inferences to be drawn are the evidence itself is in conflict. This case is unlike People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc., supra, 20 Cal.4th at page 1144, 86 Cal. Rptr.2d 816, 980 P.2d 371 where the key factsthe existence of an counsel relationship and the discussion with the client concerning the litigationwere undisputed. The center's argument that this entire case is subject to de novo review has no merit.

2. The facts viewed in a light most favorable to the disqualification order
The following constitutes substantial evidence the separate nature of the units providing legal representation did not exist at a time the mother was represented by the center. The focus of the center, which formerly represented the mother, is now on representation of children and not parents. According to Ms. Krinsky: "[T]he old tripartite structure of [Dependency Court Legal Services, Inc.] (with three semi-autonomous divisions of relatively equal size)which was established when [Dependency Court Legal Services, Inc.] represented both parents and children to enable the organization to represent three parties with conflicting interests at any given timebecame outdated and was no longer necessary to carry out the mission of [the center]." In accordance with the recommendations of a hired consultant, the center, with the approval of its board of directors, concluded that rather than having the aforementioned three separate law firms there should be a core firm with two conflict units. The former three firms each had its own autonomous director. As previously noted, the former three-firm-structure was imposed as a condition of the January 22, 1990 contract with the County of Los Angeles Board of Supervisors. However, the July 1, 2005 contract with the Administrative Office of the Courts did not require the maintenance of up to three separate law firms to provide representation in dependency matters.
There was evidence that, in 2003, while the center represented the mother, Ms. Krinsky attempted to have a staff attorney *212 in unit 2 of the center move to quash a subpoena involving a child who was a party in a federal action. Ms. Krinsky urged the staff attorney to move to quash the subpoena because it would "not look good" if the center was not cooperating with the department. While the center represented the mother, Ms. Krinsky stopped an attorney from filing Code of Civil Procedure section 170.6 affidavits against a bench officer in cases calendared in the courtroom where the lawyer was assigned. Ms. Krinsky then imposed a policy on all three offices to require her personal approval before "`blanket'" or "`class of cases'" Code of Civil Procedure 170.6 affidavits could be filed. Ms. Krinsky did not withdraw the policy until nearly one year later.[4]
There was evidence Ms. Krinsky had access to or obtained confidential information from the different units on several occasions. In the spring of 2003, while the center represented the mother, Ms. Krinsky asked one of Mr. Sherman's lawyers case specific questions about a pending matter. According to Mr. Sherman, the center, through Ms. Mandel's unit 3 firm, was representing a sibling of his office's client. There was a conflict of interest between the sibling and Mr. Sherman's office's client. Ms. di Donato declared that in 2002 and 2004, Ms. Krinsky asked her case specific questions about no less than 15 cases. Mr. Sherman and Ms. Fragasso declared that, in the spring of 2003,
Ms. Krinsky surreptitiously secured access to their law firm's confidential e-mails. As noted, Mr. Sherman's declaration states: "In approximately June of 2003 it was discovered that Ms. Krinsky had surreptitiously had our computer administrator put her [e-mail] address on each of the intraoffice confidential [e-mails] of the three law firms.... When informed of the impropriety of this breach of confidentiality, Ms. Krinsky explained that she thought it was important for her as the head of [the center] to know what was being discussed within each of the three offices." As noted, Ms. Fragasso declared: "In early summer of 2003, I discovered that Ms. Krinsky had included herself in each of these lists without informing the law firm directors of her action.... When Ms. Krinsky returned to the office and [Ms.] Mandel and I informed her of our concern, she was initially defensive and dismissive of our concern...."
In 2005, Ms. Krinsky wanted to transfer cases from the conflict units, units 2 and 3, to the core firm when an attorney left Mr. Sherman's firm. The mother did not turn 18 until March 18, 2005. Mr. Sherman informed Ms. Krinsky that he intended to comply with section 317, subdivision (d) by providing notice to the client and obtaining court permission to allow the substitution. According to Mr. Sherman, Ms. Krinsky transferred cases at her will among the three units.
*213 Ms. Fragasso spoke with Ms. Krinsky about the reassignment of cases. Ms. Fragasso explained it was necessary to confer with her clients about the transfer to a different firm and secure court permission that she be relieved as counsel of record. Ms. Fragasso's declaration relates, "Ms. Krinsky told me my concerns were without merit because the clients were not my clients, they were [the center's] clients." Ms. Fragasso was subsequently removed as director of her firm.
The foregoing demonstrates cases were moved from law firms to units and between units at Ms. Krinsky's direction without securing court permission as required by section 317, subdivision (d).[5] As noted, Ms. Krinsky objected to both Mr. Sherman and Ms. Fragasso communicating with their clients on the subject of who would be their lawyer. When Ms. Fragasso indicated she intended to communicate with her clients, she was fired. The mother presented evidence that most center cases involved conflicts of interest. According to Ms. di Donato, who worked for Mr. Sherman, after checking with the Mandel and Fragasso firms, she discovered two-thirds of her caseload involved conflicts of interests. Mr. Sherman stated that in as many as 50 percent of his firm's cases, conflicts of interests were present that required the appointment of separate counsel. According to Mr. Sherman, in 2005, cases were moved by Ms. Krinsky from his law firm to the core unit. Ms. Fragasso declared that in 2005 cases were moved from her firm to the core unit at Ms. Krinsky's direction.
Further, there was evidence legal secretaries would work in the different units. The October 20, 2005 operating procedures granted the "executive leadership" the sole authority to assign staff between the three litigation units. Finally, the purpose of the 2005 changes were described in the March 8, 2005 memorandum from the center's board of directors: "Having considered the comments from [the center] staff, as well as the advice from our outside consultant and ethics counsel, the Board has concluded that the best interests of [the center] and its clients will be served by moving [the center] to a unified and more cohesive organizational structure." The March 8, 2005 memorandum contains phrases such as: "transition to a new unified structure"; "movement to a new unified structure"; "benefits will flow from a cohesive organizational structure"; the center's "unified entity"; and "move the organization in the directions of a unified structure." Further, the March 8, 2005 board of directors' memorandum contemplated the future movement of lawyers from conflict firms to the core unit. As late as March 2006, lawyers in unit 2 were directed to secure expense approval from the head of unit 1, Ms. Mandell. There was evidence the executive director considered each client to be represented not by a unit; but by the center.
The foregoing evidence, taken together and in its context, demonstrates a breakdown of legally mandated ethical restrictions over a period of time. Many of these events occurred while the mother was represented by what is now the core unit and immediately before the filing of the section *214 300 petition filed in this case. Cases, lawyers, and files were moved amongst the three units prior to the filing of the section 300 petition in this case. Moreover, while the mother was a center client, Ms. Krinsky secured access to confidential e-mails between lawyers for all three litigation units. The mandatory ethical restraints described in Castro and Christian had to be present in order for the center to represent litigants with conflicting interests. No doubt, the evidence was in conflict as to some of the foregoing matters. But the juvenile court found, "[T]he declarations that supported the motion to recuse are more persuasive...." The juvenile court was free to reject Ms. Krinsky's denials, and those of others, of past conduct and assertions that the ethical walls mandated by Castro were currently not in force. The juvenile court's factual resolution of the disputed evidence is controlling. There is no merit to the center's argument that the evidence of ethical breaches was vague or unpersuasivethere is substantial evidence, some of it is damningly specificand that ends the issue as to what are the controlling facts on appeal.

3. The pertinent legal authority and evidence concerning the breach of ethical walls; the narrow legal basis for proper representation by one law firm maintaining strict ethical separation of operating units
As noted above, the center and its predecessor have been representing dependent children and their families since January 22, 1990, as part of agreements with local and state agencies. The January 22, 1990 and July 1, 2005 agreements specifically recognized the conflict of interest potential. In accordance with the problems of representing multiple clients with conflicting interests, the center was bound to operate within specific and mandatory guidelines for maintaining client confidentiality and adherence to rules of professional conduct. In addition, those provisions required the existence and strict maintenance of ethical walls. The contractual arrangement encompassing those provisions and procedures was thoroughly examined and survived a 1991 challenge in the case of Castro v. Los Angeles County Bd. of Supervisors, supra, 232 Cal.App.3d at pages 1435-1445, 284 Cal.Rptr. 154.
In Castro, the contractual arrangement for Dependency Court Legal Services, Inc. to provide multiple party representation was upheld by Division Three of this appellate district. Our Division Three colleagues concluded in part that Dependency Court Legal Services, Inc. was in fact three distinct law firms which had been structured to have only minimal contact with each other. (Castro v. Los Angeles County Bd. of Supervisors, supra, 232 Cal. App.3d at pp. 1441-1442, 284 Cal.Rptr.' 154.) The executive director's role was strictly an administrative one with no overlapping duties involving legal activities or representation. (Id. at pp. 1436-1437, 284 Cal.Rptr. 154.) Moreover, there was no evidence that the ethical walls had been ineffective in avoiding conflicts of interest. (Id. at pp. 1438, 1440, 284 Cal.Rptr. 154.) Our Division Three colleagues concluded that there was no actual or apparent impropriety resulting from the creation of the nonprofit corporation even though it might be representing multiple parties with conflicting interests in the same proceeding. (Id. at pp. 1441-1445, 284 Cal. Rptr. 154.) It must be emphasized our Division Three colleagues' holding was premised on the aforementioned operating rules requiring: three separate and autonomous groups; an executive director with only an administrative function unrelated to providing legal representation; separate files; and separate staff and attorneys. (Id. at pp. 1436-1438, 284 Cal.Rptr. 154.)
*215 Similarly, in People v. Christian, supra, 41 Cal.App.4th at pages 993-1002, 48 Cal. Rptr.2d 867, a defendant argued that he was denied conflict free representation because the trial court permitted the alternate defender's office in Contra Costa County to represent him. This occurred at the same time a codefendant was represented by the Contra Costa County Public Defender's Office. (Id. at p. 989, 48 Cal. Rptr.2d 867.) Christian outlined the Contra Costa County system of the legal representation of indigent defendants under the structure challenged by the defendant. Christian noted that the structure was similar to the one that had been challenged in Castro as follows: the alternate defender office was established by the county in response to escalating costs; the public defender promulgated a policy statement that articulated the nature of the alternate defender office; the alternate defender office is a formal branch of the Contra Costa County Public Defender's Office but operates autonomously with a separate supervising attorney who is responsible for directing, coordinating, and evaluating its own staff attorneys; the supervising attorney is solely responsible for providing guidance to and determining litigation strategies; the public defender exercised no control or influence over the alternate defender office; the public defender had no access to client files or client confidences; the public defender could make changes in salary or working conditions of staff only upon the specific recommendation of the alternate defender office supervising attorney; the offices were physically separate; the case files had separate numbers; the keys to the different offices were separate; the public defender did not have keys to the offices of alternate defender office and vice versa; the two offices had separate communications networks with its own separate telephone numbers, computer equipment, and facsimile transmission machines; the two offices had separate library facilities; staff were advised and required to maintained client confidences; and the files were housed separately so as to be inaccessible to the attorneys and staff from the different offices. (Id. at pp. 992-993, 48 Cal.Rptr.2d 867.) Christian concluded that the ethical walls utilized in Contra Costa County were sufficient to avoid conflicts of interest. (Id. at pp. 998-999, 48 Cal.Rptr.2d 867.)

4. No abuse of discretion occurred
Having found that the separate operating units did not exist at times pertinent to the prior representation of the mother in this case, the juvenile court was required to decide whether disqualification was warranted. Both the mother and the child assert that the juvenile court was required to disqualify the center. After the center was disqualified, a panel attorney was appointed to represent the child. On appeal, the California Appellate Project-Los Angeles assigned counsel to represent the child. Appointed appellate counsel, after consultation with the panel attorney assigned to represent the child, has filed a brief urging that the disqualification order be affirmed.
The Supreme Court held: "A trial court's authority to disqualify an attorney derives from the power inherent in every court `[t]o control in furtherance of justice, the conduct of its ministerial officers, and of all other persons in any manner connected with a judicial proceeding before it, in every matter pertaining thereto.' (Code Civ. Proc, § 128, subd. (a)(5).)" (People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc., supra, 20 Cal.4th at p. 1145, 86 Cal.Rptr.2d 816, 980 P.2d 371; accord, City and County of San Francisco v. Cobra. Solutions, Inc., 38 Cal.4th at p. 846, 43 Cal.Rptr.3d 771, 135 P.3d 20; City of Santa Barbara v. Superior *216 Court (2004) 122 Cal.App.4th 17, 23, 18 Cal.Rptr.3d 403.) Attorneys have mandatory professional duties to avoid conflicts of interests in representing different clients with adverse interests. (Rules of Prof. Conduct, rule 3-310; City and County of San Francisco v. Cobra Solutions, Inc., 38 Cal.4th at p. 846, 43 Cal.Rptr.3d 771, 135 P.3d 20; Flatt v. Superior Court (1994) 9 Cal.4th 275, 282, & fn. 2, 36 Cal. Rptr.2d 537, 885 P.2d 950; People v. Baylis (2006) 139 Cal.App.4th 1054, 1064, 43 Cal.Rptr.3d 559.) In order to protect the administration of justice and the integrity of the bar, a court will enforce an attorney's professional duty to avoid conflicts of interest by disqualifying counsel if necessary. (People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc., supra, 20 Gal.4th at pp. 1145-1146, 86 Cal.Rptr.2d 816, 980 P.2d 371; Flatt v. Superior Court, supra, 9 Cal.4th at pp. 283-284, 36 Cal.Rptr.2d 537, 885 P.2d 950.) A court is required to protect the public's perception of the judicial process and bar's integrity but also the client's right to ethical representation of counsel. (City and County of San Francisco v. Cobra Solutions, Inc., supra, 38 Cal.4th at p. 846, 43 Cal.Rptr.3d 771, 135 P.3d 20; People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc., supra, 20 Cal.4th at pp. 1145-1146, 86 Cal.Rptr.2d 816, 980 P.2d 371; Flatt v. Superior Court, supra, 9 Cal.4th at pp. 283-284, 36 Cal.Rptr.2d 537, 885 P.2d 950.)
A conflict of interest may be precipitated by an attorney's successive representation of clients with opposing interests. (Flatt v. Superior Court, supra, 9 Cal.4th at pp. 283-284, 36 Cal.Rptr.2d 537, 885 P.2d 950; People v. Baylis, supra, 139 Cal.App.4th at p. 1064, 43 Cal.Rptr.3d 559.) The main fiduciary obligation at risk when successive representation occurs is that of confidentiality. (City and County of San Francisco v. Cobra Solutions, Inc., supra, 38 Cal.4th at p. 846, 43 Cal.Rptr.3d 771, 135 P.3d 2Q; People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc., supra, 20 Cal.4th at p. 1146, 86 Cal.Rptr.2d 816, 980 P.2d 371; People v. Baylis, supra, 139 Cal.App.4th at p. 1065, 43 Cal.Rptr.3d 559.) The confidentiality obligation is protected by Business and Professions Code section 6068, subdivision (e)(1), which states, "It is the duty of an attorney ... [¶] (e)(1) To maintain inviolate the confidence, and at every peril to himself or herself to preserve the secrets, of his or her client." Rules of Professional Conduct, rule 3-310(E) protects the confidentiality duty by providing, "A member shall not, without the informed written consent of the client or former client, accept employment adverse to the client or former client where, by reason of the representation of the client or former client, the member has obtained confidential information material to the employment." Rules of Professional Conduct, rule 3-310(E) is designed to protect client confidentiality which survives the termination of the attorney's representation. (Bus. & Prof.Code, § 6068, subd. (e); City and County of San Francisco v. Cobra Solutions, Inc., 38 Cal.4th at p. 846, 43 Cal. Rptr.3d 771, 135 P.3d 20; People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc., supra, 20 Cal.4th at p. 1147, 86 Cal.Rptr.2d 816, 980 P.2d 371; Pound v. DeMera DeMera Cameron (2005) 135 Cal.App.4th 70, 77-78, 36 Cal. Rptr.3d 922.)
The Supreme Court has explained a court's duty when faced with a successive representation scenario thusly: "[The] enduring duty to preserve client confidences precludes an attorney from later agreeing to represent an adversary of the attorney's former client unless the former client provides an `informed written consent' waiving the conflict. [Citation.] If *217 the attorney fails to obtain such consent and undertakes to represent the adversary, the former client may disqualify the attorney by showing a `"substantial relationship"' between the subjects of the prior and the current representations. [Citation.] To determine whether there is a substantial relationship between successive representations, a court must first determine whether the attorney had a direct professional relationship with the former client in which the attorney personally provided legal advice and services on a legal issue that is closely related to the legal issue in the present representation. [Citation.] If the former representation involved such a direct relationship with the client, the former client need not prove that the attorney possesses actual confidential information. [Citation.] Instead, the attorney is presumed to possess confidential information if the subject of the prior representation put the attorney in a position in which confidences material to the current representation would normally have been imparted to counsel. [Citations.] When the attorney's contact with the prior client was not direct, then the court examines both the attorney's relationship to the prior client and the relationship between the prior and the present representation. If the subjects of the prior representation are such as to `make it likely the attorney acquired confidential information' that is relevant and material to the present representation, then the two representations are substantially related. [Citation]; see Farris v. Fireman's Fund Ins. Co. (2004) 119 Cal.App.4th 671, 680, 14 Cal.Rptr.3d 618 [material confidential information is that which is `directly at issue in' or has `some critical importance to, the second representation']. When a substantial relationship between the two representations is established, the attorney is automatically disqualified from representing the second client." (City and County of San Francisco v. Cobra Solutions, Inc., supra, 38 Cal.4th at p. 847, 43 Cal.Rptr.3d 771, 135 P.3d 20; Flatt v. Superior Court, supra, 9 Cal.4th at p. 283, 36 Cal.Rptr.2d 537, 885 P.2d 950.)
There is no doubt that the child's and the mother's interests are conflicting. The child is a newborn, who needs the protection of the juvenile court to protect her from neglect or abuse. The mother had been depressed before and after the child's birth. The mother admitted using marijuana while she was pregnant. Further, the mother was upset that the child was a girl, as distinguished from a boy. Unit 1 of the center had previously represented the mother. Unit 2 of the center represented the child's sibling, Donna, in the litigation which led ultimately to the termination of the mother's parental rights. Unit 3 was assigned to represent the child. Ms. Krinsky, who had access to privileged information in all units, was personally involved in the movement of cases with conflicts of interest to the core unit of which she was a part. The current proceeding is substantially related to the former proceedings in which unit 1 of the center represented the mother. The prior proceeding involving the child's sibling concerned the mother's ability to care for a youngster. The mother's background, including her mental health history, are directly pertinent to the current dependency proceeding. Without abusing its discretion, the juvenile court could find information about each of these issues was obtained by lawyers and secretaries employed by the center while representing the mother in two prior dependency proceedings. Because there is a substantial relationship between the current action and the prior representation, it is presumed that confidential information was disclosed. (People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, *218 Inc., supra, 20 Cal.4th at pp. 1153-1154, 86 Cal.Rptr.2d 816, 980 P.2d 371; Flatt v. Superior Court, supra, 9 Cal.4th at pp. 283-284, 36 Cal.Rptr.2d 537, 885 P.2d 950; Zador Corp. v. Kwan (1995) 31 Cal. App.4th 1285, 1294, 37 Cal.Rptr.2d 754.) Thus, given the factual findings made by the juvenile court, disqualification was mandatory and no abuse of discretion occurred. Had the ethical walls mandated by Castro been maintained at a time when the mother was represented by the center and the juvenile court concluded they were enforced at present, I would obviously reach an entirely different conclusion.
NOTES
[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.
[2] Courts have noted that "[m]otions to disqualify counsel are especially prone to tactical abuse. ..." (City of Santa Barbara v. Superior Court (2004) 122 Cal.App.4th 17, 23, 18 Cal. Rptr.3d 403 (City of Santa Barbara); accord, People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc. (1999) 20 Cal.4th 1135, 1145, 86 Cal.Rptr.2d 816, 980 P.2d 371 (SpeeDee Oil); Faughn v. Perez (2006) 145 Cal.App.4th 592, 602, 51 Cal.Rptr.3d 692.)
[3] Mother did not submit her own sworn statement in support of her motion.
[4] "California has not adopted the ABA Model Rules ..., although they may serve as guidelines absent on-point California authority or a conflicting state public policy." (Cobra Solutions, supra, 38 Cal.4th at p. 852, 43 Cal. Rptr.3d 771, 135 P.3d 20.)
[5] Section 124(1) of the Restatement provides, "[An imputed conflict] does not restrict an affiliated lawyer when the affiliation between the affiliated lawyer and the personally prohibited lawyer that required the imputation has been terminated, and no material confidential information of the client, relevant to the matter, has been communicated by the personalty prohibited lawyer to the affiliated lawyer or that lawyer's firm."
[6] For purposes of this analysis, it may be assumed that a violation of the safeguards approved in Castro, supra, 232 Cal.App.3d 1432, 284 Cal.Rptr. 154, would require disqualification of both Center attorneys involved in a concurrent-conflict case, in which, by definition, both attorneys would be personally and directly involved in representing adverse interests. Nothing in Castro, however, states that the safeguards approved in that case represent the absolute minimum required to comply with the ethics rules in concurrent-conflict cases, nor is such a conclusion necessarily warranted, given the development of the law in this area in the more than fifteen years since Castro was decided.
[7] The reference to "appearance" is not a holding and is contrary to later cases. (See DCH Health Services Corp. v. Waite (2002) 95 Cal.App.4th 829, 833, 115 Cal.Rptr.2d 847.)
[8] Many public interest law firms engage in advocacy while vigorously representing individual clients. (See, e.g., Federal Defenders of San Diego, Inc. v. United States Sentencing Commission (1988) 680 F.Supp. 26; Legal Aid Foundation of Los Angeles, Major Advocacy Report 2005 [highlighting "the year's efforts to support our assistance to individual clients by working to more broadly challenge conditions of poverty and injustice"].)
[1] Shadonna did present evidence of some problematic or potentially problematic practices in CLC during the relevant period, but they were not problematic in ways which affect the Castro analysis. For instance, there was evidence that when a lawyer left CLC, that lawyer's cases were reassigned without a lawyer-client consultation or a motion for relief under Welfare and Institutions Code section 317, subdivision (d). That might be a problem for the trial court or for new counsel, but does not seem to me to indicate that CLC had, in practice, broken down the walls that made it possible for DCLS to represent multiple parties in the same litigation. Similarly, at oral argument, the parties made much of the fact that under the DCLS system, an individual unit, titled "The Law Firm of [Unit Director]," was appointed. In this case, the minute order reads "CLC3 Attorney, Linda Jackson, appointed...." Citing the relevant court rule (Super. Ct. L.A. County, Local Rules, rule 17.16) and its contract with the Administrative Offices of the Court, CLC asserts that it is the entity appointed for the child. I do see that appointment of CLC, rather than its individual units, could create the appearance that the units operate as one firm, and I believe that the appearance of a conflict is best avoided, especially where counsel is court-appointed, but an appearance of conflict is not grounds for disqualification. (DCH Health Services Corp. v. Waite (2002) 95 Cal.App.4th 829, 115 Cal.Rptr.2d 847.)
[2] There was a representation in the trial court that Shadonna's counsel was the holder of her physician-patient privilege.
[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.
[2] In addition, Dependency Court Legal Services, Inc. was contractually required to follow the "Operating Rules and Procedures" set forth in exhibit A to the January 22, 1990 agreement: "1. [Dependency Court Legal Service, Inc.'s] staff attorneys (i.e. those actually providing representation in dependency court proceedings) must be organized into three separate offices of comparable quality. [H] 2. Each office shall have its own separate administrator. Each office administrator shall be the attorney of record on all cases assigned to his or her office, with the staff attorneys assigned to that office serving as deputies or assistants. Each office administrator shall be responsible for all legal representation provided by the attorneys in his or her office and shall have full case management authority over all cases assigned to that office. [¶] 3. Each office shall maintain separate case files. No staff attorney shall have access to the case files of an office other than one to which he or she is assigned, and no corporate officer or director shall have access to any case files, [¶] 4. Attorneys may not be transferred between offices, [¶] 5. [Dependency Court Legal Services, Inc.'s] corporate officers and directors shall serve in an administrative capacity only and shall not participate in any way in the representation of individuals in dependency court proceedings. They shall not consult with staff attorneys, including office administrators, about individual cases, except to review performance after the matter has been completed. [¶] 6. Staff attorneys (including office administrators) shall not hold any corporate officer or director positions with [Dependency Court Legal Services, Inc.]. [¶] 7. [Dependency Court Legal Services, Inc.'s] corporate officers shall promote, discipline, or dismiss a staff attorney only upon the recommendation of that attorney's office administrator. Corporate officers shall be responsible for hiring staff attorneys and for assigning them to offices in such a manner as to maintain the comparable quality of the three offices. [¶] 8. [Dependency Court Legal Services, Inc.'s] corporate officers and directors may participate in the training of staff attorneys and office administrators, but such training shall be provided on an equal basis to the attorneys in the three offices. [¶] 9. Each office administrator shall establish and promulgate a procedure to receive and resolve complaints."
[3] The October 20, 2005 memorandum states: "1. [The center] staff will continue to be assigned by [the center's] executive leadership to a core unit or such other conflict unit or units as [the center] may choose to maintain over time (currently denoted as [the center unit Nos.] 1, 2, and 3). The conflict unit or units will handle cases with siblings where conflicts of interest are present (`conflict cases')to be denoted on [the center's] file and records as conflict casesas well as any other nonconflict cases that may previously or in the future be assigned to that unit. Attorneys in all [center] units will continue to pick up new cases in accordance with their assigned pick up days, as determined by [the center's] supervisors. Any determination that a conflict exists in a given case will be made only after consultation with, and approval by, a supervisor, as set forth in [the center's] conflict policy. [¶] 2. Each of [the center's] units will operate pursuant to the procedures set forth herein to ensure that ethical walls for handling conflict cases within [the center] remain in place and are honored at all times. Any questions or concerns that these procedures do not adequately preserve the separateness of conflict cases or that these procedures are not being complied with shall be directed to [the center's] Executive Director or the appropriate unit head. [H] 3. Each [center] unit shall have a unit head. The conflict head(s) shall ensure that conflict case files and all confidential case information relating to conflict cases assigned to a given unit are maintained by that unit, remain separate from the case files and confidential case information of the core firm and any other conflict unit(s), and cannot be accessed by any staff outside the conflict unit. The conflict unit(s) head(s) and any other conflict unit supervisors shall supervise, direct and coordinate the day-to-day representation and case-related decision making in regard to conflict cases and conflict clients assigned to that unit and will be the final decision-maker in regard to those case-specific issues. [¶] 4. Our practice for promoting, terminating or disciplining [the center] lawyers or staff members is unchanged. The [center] Executive Director or his or her designee will remain the final decision-maker after considering a recommendation from the unit head or supervisor of that staff member, along with the basis for that recommendation. In evaluating that recommendation, the [center] Executive Director will not have access to conflict unit case files, or any conflict unit client confidential information. [¶] 5. No attorney shall have access to the case files or confidential client information relating to any clients of other units in conflict with that attorney's clients. [¶] 6. Where no conflict of interest or ethical concerns exist, cases may be reassigned within [the center], and in particular from the conflict unit(s) to the core firm. [¶] 7. [The center's] executive leadership shall be responsible for hiring and training staff attorneys and for assigning them, as appropriate and consistent with the Board's restructuring plan, to the core firm or conflict unit(s). All attorneys and staff shall receive training regarding the necessity of maintaining client confidences. [¶] 8. [The center] will continue to remain counsel for all clients assigned to [the center]. To ensure that the appropriate staff member receives notices, pleadings, and other information relating to clients, individual attorneys within [the center] will serve as the responsible attorneythe attorney of recordfor cases assigned to that attorney. If those individual attorneys leave [the center's] employ or change courtrooms or caseloads, a notice will be filed with the court and sent to all critical persons and entities, designating the new responsible attorney of record within [the center]. As noted above, the conflict unit head(s) will maintain ultimate and final responsibility for the supervision, direction and coordination of case-related decision making in regard to conflict cases and conflict clients assigned to that unit and will be the final decision-maker in regard to those case-specific issues."
[4] There is no evidence any "`blanket'" affidavits of peremptory disqualification were ever filed. In McCartney v. Commission on Judicial Qualifications (1974) 12 Cal.3d 512, 538, footnote 13, 116 Cal.Rptr. 260, 526 P.2d 268, our Supreme Court expressed its disapproval of the blanket filing of Code of Civil Procedure section 170.6 motions where no individual assessments of prejudice were made in each case. In Solberg v. Superior Court (1977) 19 Cal.3d 182, 203, 137 Cal. Rptr. 460, 561 P.2d 1148, our Supreme Court expressly reaffirmed its "strong[ ] disapprov[al]" of the practice. Ms. Krinsky's declaration states a blanket affidavit policy which was "not tethered to a particular case" was adopted by the center. In fall 2003, Mr. Sherman stated Ms. Krinsky retained the sole authority to authorize the filing of affidavits on a "`blanket' basis" or in a "`class of cases.'" There is no evidence Ms. Krinsky or any lawyer affiliated with the center filed "`blanket'" affidavits in a "`class of cases.'"
[5] Section 317, subdivision (d) states: "The counsel appointed by the court shall represent the parent, guardian, or child at the detention hearing and at all subsequent proceedings before the juvenile court. Counsel shall continue to represent the parent, guardian, or child unless relieved by the court upon the substitution of other counsel or for cause. The representation shall include representing the parent, guardian, or the child in termination proceedings and in those proceedings relating to the institution or setting aside of a legal guardianship."